**ORAL ARGUMENT NOT YET SCHEDULED**
No. 23-5311

# United States Court of Appeals
# for the District of Columbia Circuit

Norwich Pharmaceuticals, Inc.,

*Plaintiff-Appellant*,

v.

Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services; Martin Makary, in his official capacity as Commissioner of Food and Drugs; United States Food and Drug Administration,

*Defendants-Appellees*,

Salix Pharmaceuticals, Inc.,

*Intervenor for Defendants-Appellees.*

On Appeal from the United States District Court for the District of Columbia,
No. 23-cv-1611 (Hon. Randolph D. Moss)

## OPENING BRIEF OF APPELLANT
## NORWICH PHARMACEUTICALS, INC.

Matthew S. Murphy
Axinn, Veltrop & Harkrider LLP
90 State House Square
Hartford, CT 06103
(860) 275-8100
mmurphy@axinn.com

Nicholas L. Schlossman
Latham & Watkins LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
(737) 910-7314
nicholas.schlossman@lw.com

June 13, 2025

Andrew D. Prins
Peter E. Davis
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
andrew.prins@lw.com
peter.davis@lw.com

*Counsel for Plaintiff-Appellant
Norwich Pharmaceuticals, Inc.*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.  Parties and Amici

Appellant Norwich Pharmaceuticals, Inc. was plaintiff in the case below.

Appellees Robert F. Kennedy, Jr., Secretary of the Department of Health and Human Services; Martin Makary, Commissioner of Food and Drugs; and the United States Food and Drug Administration were defendants in the case below. Individuals sued in their official capacities have been substituted.

Salix Pharmaceuticals, Inc. intervened in support of defendants below and remains intervenor in this appeal.

There were no other parties, intervenors, or amici before the district court, and no amici have appeared in this Court.

## B.  Ruling Under Review

The final judgment under review is the Order Denying Norwich's Motion for Preliminary Injunction and Granting FDA and Salix's Cross-Motions for Summary Judgment (Nov. 1, 2023), JA__-__ (Dkt. 66); *see also* JA__ (Dec. 4, 2023 Minute Order) (directing docket to be closed).  The judgment was supported by a Memorandum Opinion (Nov. 1, 2023), JA__-__, __-__ (Dkts. 65, 67).  The court treated Norwich's motion for preliminary injunction as a motion for summary

judgment and consolidated it with "a full consideration of the merits under Federal Rule of Civil Procedure 65(a)(2)." JA__ (June 18, 2023 Minute Order). The district court's opinion is available at *Norwich Pharmaceuticals, Inc. v. Becerra*, 703 F. Supp. 3d 1 (D.D.C. 2023) (Moss, J.).

## C. Related Cases

This case has not been previously before this Court. This case involves substantially the same parties and similar issues as *Norwich Pharmaceuticals Inc. v. Kennedy*, No. 25-5137 (D.C. Cir.). A motions panel directed the Clerk to "schedule No. 23-5311 and No. 25-5137 for oral argument on the same day before the same panel." Order, *Norwich Pharmaceuticals Inc. v. Kennedy*, No. 23-5311 (D.C. Cir. May 21, 2025).

The following cases also involved the same parties and related issues: *Salix Pharmaceuticals, Ltd. v. Norwich Pharmaceuticals Inc.*, 98 F.4th 1056 (Fed. Cir.), *cert. denied*, 145 S. Ct. 567 *and* 145 S. Ct. 983 (2024); *Salix Pharmaceuticals, Inc. v. Norwich Pharmaceuticals, Inc.*, No. 1:24-cv-7140 (D.N.J. filed June 20, 2024).

*/s/ Andrew D. Prins*
Andrew D. Prins

*Attorney for Appellant*
*Norwich Pharmaceuticals, Inc.*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Appellant Norwich Pharmaceuticals, Inc. certifies that the following are parent companies, subsidiaries, affiliates, or companies which directly or indirectly own at least 10% of the stock of Norwich:  Alvogen Pharma US, Inc.; Alvogen Group, Inc.; New Alvogen Group Holding, Inc.; Alvogen Lux Holding S.à.r.l.; and Aztiq Pharma Partners S.a.r.l.

/s/Andrew D. Prins
Andrew D. Prins

*Attorney for Appellant*
*Norwich Pharmaceuticals, Inc.*

## TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.................................. iii

TABLE OF AUTHORITIES ...................................................................vi

GLOSSARY.........................................................................................xi

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION.............................................................7

ISSUE PRESENTED ..............................................................................8

STATUTES AND REGULATIONS.............................................................8

STATEMENT OF THE CASE...................................................................8

    A.    Legal Background .....................................................................8

        1.    Legal Framework for Approval of Generic Drugs ....................8

        2.    Patent Certifications and Statements .........................................9

        3.    Paragraph IV Certifications and Patent Litigation...................11

        4.    Post-Patent-Litigation Amendments.........................................12

        5.    The FDCA's Four Approval Timing Rules ..............................13

    B.    Factual Background...................................................................17

        1.    Rifaximin and Salix's Xifaxan ................................................17

        2.    Actavis's ANDA for Rifaximin ...............................................17

        3.    Norwich's ANDA No. 214,369 and the Delaware Judgment ................................................................................19

        4.    Post-Judgment Proceedings on Norwich's ANDA No. 214,369................................................................................22

**Page**

      5.      FDA's Tentative Approval Decision ........................................24

    C.    Procedural Background ....................................................................26

        1.      The APA Action Below and Decision Under Review.............26

        2.      The Federal Circuit's Decision ...................................................27

        3.      Norwich's ANDA No. 214,370 and Related Litigation ..........29

SUMMARY OF ARGUMENT ................................................................30

ARGUMENT ........................................................................................32

    I.    THE DELAWARE JUDGMENT DELAYING APPROVAL
        OF THE ORIGINAL '369 ANDA DOES NOT DELAY
        APPROVAL OF THE AMENDED '369 ANDA .............................33

    A.    The Text and Structure of the FDCA Makes Clear that a §
        271(e)(4) Order, Read in Context, Does Not Delay Approval of
        an Amended ANDA with Distinct Patent Certifications ...................33

    B.    FDA's Binding Regulations Also Make Clear that a § 271(e)(4)
        Order, Read in Context, Does Not Delay Approval of an
        Amended ANDA with Distinct Patent Certifications .........................38

    C.    The Delaware Court's Judgment Did Not Purport to Delay
        Approval of an Amended ANDA Never Considered or Ruled
        upon by that Court ..............................................................................40

    D.    The Post-Judgment Rule 60 Order Reaffirms the Meaning of
        the Judgment ......................................................................................48

    II.    FDA'S CONTRARY POSITION COUNTERMANDS THE
        STATUTE'S PURPOSE AND HISTORY .........................................53

CONCLUSION ....................................................................................57

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*3M v. Barr Laboratories, Inc.*,
  289 F.3d 775 (Fed. Cir. 2002) ...........................................................52

*Amneal Pharmaceuticals LLC v. FDA*,
  285 F. Supp. 3d 328 (D.D.C. 2018)......................................................9

*In re Barr Laboratories, Inc.*,
  930 F.2d 72 (D.C. Cir. 1991) ..............................................................54

*\*Caraco Pharmaceutical Laboratories, Ltd. v. Novo Nordisk A/S*,
  566 U.S. 399 (2012)......................................... 4, 7, 9, 10, 11, 12, 14, 22, 38, 53, 54

*Ferring B.V. v. Watson Laboratories, Inc.*,
  764 F.3d 1401 (Fed. Cir. 2014) ..........................................................34

*\*Ferring B.V. v. Watson Laboratories, Inc.-Florida*,
  764 F.3d 1382 (Fed. Cir. 2014) ...............................................47, 48, 50

*FTC v. Actavis, Inc.*,
  570 U.S. 136 (2013)...........................................................................19

*GlaxoSmithKline LLC v. Teva Pharmaceuticals USA, Inc.*,
  7 F.4th 1320 (Fed. Cir. 2021) .............................................................52

*Marin Audubon Society v. FAA*,
  121 F.4th 902 (D.C. Cir. 2024)...........................................................33

*Mayor & Aldermen of Vicksburg v. Henson*,
  231 U.S. 259 (1913)...........................................................................45

*McKenzie County v. United States*,
  131 F.4th 877 (8th Cir. 2025) .................................................41, 42, 45

*Mylan Laboratories, Inc. v. Thompson*,
  389 F.3d 1272 (D.C. Cir. 2004)..........................................................52

**Page(s)**

*National Environmental Development Association's Clean Air Project*
*v. EPA*,
752 F.3d 999 (D.C. Cir. 2014) ........................................................38

*Nix v. Billington*,
448 F.3d 411 (D.C. Cir. 2006) ...........................................41, 42, 45

*Norwich Pharmaceuticals, Inc. v. Kennedy*,
No. 25-cv-91, 2025 WL 1148463 (D.D.C. Apr. 18, 2025) ...............29

*Purepac Pharmaceutical Co. v. Thompson*,
354 F.3d 877 (D.C. Cir. 2004) .......................................................11

*Salix Pharmaceuticals, Ltd. v. Norwich Pharmaceuticals Inc.*,
98 F.4th 1056 (Fed. Cir. 2024) ..................... 27, 28, 45, 46, 47, 49, 55

*Sandoz Inc. v. Becerra*,
57 F.4th 272 (D.C. Cir. 2023) .......................................................8, 9

*Sanofi-Aventis v. Apotex Inc.*,
659 F.3d 1171 (Fed. Cir. 2011) .......................................................18

*Teva Pharmaceuticals, USA, Inc. v. Leavitt*,
548 F.3d 103 (D.C. Cir. 2008) ..................................................8, 9, 10

*Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp.*,
482 F.3d 1330 (Fed. Cir. 2007) .................................................32, 54

*Teva Pharmaceuticals USA, Inc. v. Sebelius*,
595 F.3d 1303 (D.C. Cir. 2010) .....................................................25

*Thaler v. Perlmutter*,
130 F.4th 1039 (D.C. Cir. 2025) ...................................................30

*UC Health v. NLRB*,
803 F.3d 669 (D.C. Cir. 2015) .......................................................49

*United States v. Spallone*,
399 F.3d 415 (2d Cir. 2005) .....................................................42, 45

**Page(s)**

## STATUTES AND REGULATIONS

5 U.S.C. §§ 701-706 ................................................................................7

5 U.S.C. § 706(2)(A) ............................................................................30

21 U.S.C. § 355(a)-(b) ...........................................................................8

21 U.S.C. § 355(d) .................................................................................8

21 U.S.C. § 355(j)(2) ..............................................................................9

21 U.S.C. § 355(j)(2)(A) .........................................................................2

21 U.S.C. § 355(j)(2)(A)(vii) ...............................................................10

21 U.S.C. § 355(j)(2)(A)(vii)(III) ........................................................14

21 U.S.C. § 355(j)(2)(A)(viii)...............................................4, 11, 12, 16

21 U.S.C. § 355(j)(2)(B)(i) ...................................................................11

21 U.S.C. § 355(j)(5) .........................................................................1, 9

21 U.S.C. § 355(j)(5)(A) .......................................................................13

21 U.S.C. § 355(j)(5)(B) ...............................5, 13, 15, 35, 36, 37

21 U.S.C. § 355(j)(5)(B)(i) .........................................................2, 14, 37

21 U.S.C. § 355(j)(5)(B)(ii) .......................................................2, 12, 14

21 U.S.C. § 355(j)(5)(B)(iii) ...........................................2, 11, 12, 15, 35

21 U.S.C. § 355(j)(5)(B)(iii)(I)(aa) .....................................................37

21 U.S.C. § 355(j)(5)(B)(iii)(II) ...........................................................35

21 U.S.C. § 355(j)(5)(B)(iii)(II)(bb) ................................................3, 34

21 U.S.C. § 355(j)(5)(B)(iv) ...........................................................15, 18

28 U.S.C. § 1291 .....................................................................................7

**Page(s)**

28 U.S.C. § 1331 ...................................................................................7

35 U.S.C. § 271(a)-(b) .........................................................................52

35 U.S.C. § 271(e)(2) ...............................................................34, 36, 47

35 U.S.C. § 271(e)(2)(A) ................................................................11, 46

35 U.S.C. § 271(e)(4) ........................... 11, 21, 27, 34, 36, 46, 47

35 U.S.C. § 271(e)(4)(A) ....................................................................43

Pub. L. No. 98-417, 98 Stat. 1585 (1984) ...........................................1

21 C.F.R. § 314.94(a)(8)(iv) .......................................................4, 11, 38

21 C.F.R. § 314.94(a)(12)(viii) .......................................................22, 39

21 C.F.R. § 314.94(a)(12)(viii)(A) ............ 4, 6, 12, 31, 36, 39, 52

21 C.F.R. § 314.105(d) ........................................................................25

21 C.F.R. § 314.107(b)(1)(ii) ............................................6, 31, 40, 54

## OTHER AUTHORITIES

81 Fed. Reg. 69,580 (Oct. 6, 2016) .....................................................40

86 Fed. Reg. 4083 (Jan. 15, 2021) .......................................................55

89 Fed. Reg. 61,446 (July 31, 2024) ....................................................55

*Current and future treatments for IBS-D associated with diarrhea*,
   Mayo Clinic (Sept. 5, 2015), https://www.mayoclinic.org/medical-
   professionals/digestive-diseases/news/current-and-future-
   treatments-for-ibs-d/mac-20429499 ...............................................17

Fed. R. Civ. P. 60(b)(2)-(3) .................................................................23

Fed. R. Civ. P. 60(b)(5) .......................................................................23

Fed. R. Civ. P. 65(d)(2) .......................................................................34

**Page(s)**

GoodRx, Xifaxan,
https://www.goodrx.com/xifaxan?form=tablet&dosage=
550mg&quantity=42&label_override=xifaxan (last visited June 11,
2025) ...............................................................................................................17

Press Release, Bausch Health, *Bausch Health Announces Resolution
Of XIFAXAN® Intellectual Property Litigation* (Sept. 12, 2018),
https://ir.bauschhealth.com/news-releases/2018/09-12-2018-
120152669...........................................................................................................18

## GLOSSARY

| Abbreviation/acronym | Description |
| --- | --- |
| '369 ANDA | Norwich's ANDA No. 214,369 |
| '370 ANDA | Norwich's ANDA No. 214,370 |
| Actavis | Actavis Laboratories FL, Inc. |
| ANDA | Abbreviated New Drug Application |
| APA | Administrative Procedure Act |
| FDA | Food and Drug Administration |
| FDCA | Federal Food, Drug, and Cosmetic Act |
| HE | Hepatic Encephalopathy |
| IBS-D | Irritable Bowel Syndrome with Diarrhea |
| Norwich | Norwich Pharmaceuticals, Inc. |
| Salix | Salix Pharmaceuticals, Inc. |

# INTRODUCTION

This case concerns the Food and Drug Administration's ("FDA") decision to keep an important generic drug off the market even after a final judgment held that all relevant patents were invalid and/or not infringed. That outcome is inconsistent with the text, structure, and purpose of the Hatch-Waxman Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984), and it is in no way supported by the patent judgment on which FDA relied.

Congress enacted the Hatch-Waxman Act in 1984 to incentivize and expedite the marketing of generic drugs—lower-cost competitors to branded, monopoly drugs. A generic drug that is the "same" as a previously approved, branded drug, and is otherwise approvable, shall be approved by FDA within 180 days of the filing of an Abbreviated New Drug Application ("ANDA") *unless* (a) the branded drug's patent rights block the ANDA's immediate approval, or (b) approval is delayed by a period of statutory marketing exclusivity. *See* 21 U.S.C. § 355(j)(5).

In the agency proceeding below, Plaintiff-Appellant Norwich Pharmaceuticals, Inc. ("Norwich") sought FDA approval for ANDA No. 214,369 ("'369 ANDA") to market the first generic version of the antibiotic rifaximin for treatment of irritable bowel syndrome with diarrhea ("IBS-D"), a common gastrointestinal condition. Despite Norwich seeking approval for six years and obtaining final judgments that no relevant patents block approval of the '369 ANDA

for the treatment of IBS-D, FDA has refused to grant the ANDA final approval—not because of any scientific or medical deficiency, but because FDA misapplied the law. The district court erred in concluding otherwise and declining to set aside FDA's decision withholding final approval of Norwich's ANDA.

Here is the context. In December 2019, Norwich submitted the '369 ANDA seeking approval for a generic version of rifaximin that would end Intervenor-Defendant-Appellant Salix Pharmaceuticals, Inc.'s ("Salix") now over-20-year-old monopoly over marketing that drug. The Federal Food, Drug, and Cosmetic Act ("FDCA") requires ANDA applicants to file "patent certifications" identifying patents associated with the prior, branded drug, to facilitate notice to branded drug sponsors like Salix that their rights might be impacted by such an ANDA, so that they can litigate any relevant patent claims. *See id.* § 355(j)(2)(A). If an ANDA applicant makes patent certifications, the FDCA qualifies the default 180-day deadline for approval of an ANDA. Specifically, the FDCA includes timing rules that provide, generally speaking, that an ANDA is approvable once the patents identified in the ANDA applicant's certifications expire, or, if those patents are challenged by the ANDA applicant and timely litigated, held invalid or not infringed. *Id.* § 355(j)(5)(B)(i)-(iii).

Norwich filed certifications with its ANDA identifying Salix's relevant patents. In the resultant patent litigation, the U.S. District Court for the District of

Delaware ruled that Salix's patents concerning the use of rifaximin for the treatment of IBS-D were invalid or not infringed by the '369 ANDA, thus posing no obstacle to approval of Norwich's ANDA for treatment of IBS-D. The Delaware court also held, however, that certain patents covering a distinct use of rifaximin to reduce the risk of recurrence of overt hepatic encephalopathy ("HE"), a brain disorder, were valid and infringed by the '369 ANDA's then-labeled use of rifaximin to also reduce the risk of recurrent HE (the "HE Indication").[1] As authorized by the statute governing infringement of patents, the court issued an order under 35 U.S.C. § 271(e)(4)(A) setting the effective date of approval of the operative '369 ANDA containing the HE patent certifications to the date that the infringed HE patents expired, October 2, 2029. Under the FDCA's ANDA approval timing rules, had Norwich not amended its ANDA, the statute would have instructed FDA to make the approval effective no earlier than the date specified by the Delaware court's order. *See* 21 U.S.C. § 355(j)(5)(B)(iii)(II)(bb).

But, as permitted by the FDCA and FDA's regulations, Norwich did amend the original '369 ANDA, removing from its label all references to treatment or prevention of HE, *i.e.*, the infringing use, and accordingly removed from its ANDA the certifications to the HE patents. The FDCA and its implementing regulations

---

[1]  An "indication" is FDA parlance for the use of a drug to treat a particular disease, condition, symptom, and/or population, as identified in a drug's label.

allow an applicant to seek approval of such a "skinny label" that "'carves out' from the brand's approved label the still-patented methods of use." *Caraco Pharm. Laboratories, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 406 (2012) (citing 21 C.F.R. § 314.94(a)(8)(iv)); *see also* 21 U.S.C. § 355(j)(2)(A)(viii); 21 C.F.R. § 314.94(a)(12)(viii)(A) (authorizing amendment to create such a "skinny label"). Once Norwich removed the HE Indication and the relevant HE patent certifications from its ANDA, there was no patent-based obstacle to immediate approval. *See* 21 U.S.C. § 355(j)(2)(A)(viii); 21 C.F.R. § 314.94(a)(12)(viii)(A).

FDA, however, did not immediately approve the ANDA as required by the statute and FDA's regulations. Instead, FDA determined that the Delaware court's judgment as to the pre-amendment ANDA containing certifications to the HE patents requires FDA to delay approval of even the amended ANDA lacking those certifications until the HE patents expire on October 2, 2029. FDA so found because the Delaware judgment states that "the effective date of . . . Norwich's ANDA No. 214,369 is to be a date not earlier than" the HE patents' expiry in 2029. JA__ (AR42). Norwich brought this Administrative Procedure Act ("APA") action challenging FDA's refusal to grant final approval.

The district court below upheld FDA's decision. While acknowledging that "Norwich raise[d] a substantial argument" challenging FDA's determination, the court rejected Norwich's position. JA__ (Dkt. 67 at 34). The court reasoned that

4

FDA correctly found that the Delaware court's judgment as to the then-operative "ANDA No. 214,369" delayed approval of the *amended* ANDA containing a distinct, non-infringing label, and lacking the HE patent certifications, because the amended ANDA still carried the number 214,369.

That decision was erroneous. FDA misinterpreted the scope and effect of the Delaware court's judgment as applied to the amended '369 ANDA. That judgment delayed approval of only the then-operative, original ANDA containing the HE Indication and certifications to the HE patents, not any subsequent amended ANDA *lacking* the HE Indication and HE patent certifications.

FDA does not review patent court judgments in the abstract, but rather in the context of the statutory regime Congress has charged it with administering and its implementing regulations. Specifically, the FDCA provides that an ANDA's approval date shall be determined by applying four statutory timing rules to "each certification made" by the applicant in an "application submitted" under § 355(j). 21 U.S.C. § 355(j)(5)(B). Under the relevant timing rule here, a court that finds infringement of a given patent in a specific certification may determine the date upon which the application in front of it containing that specific patent certification may be approved. *Id.* § 355(j)(5)(B)(iii)(II). The amended '369 ANDA that Norwich filed after the patent court's judgment does not contain any certification relating to the HE patents that gave rise to the patent court's judgment delaying approval until

the expiry of the latest of the HE patents.  FDA should not have read that judgment as precluding approval of the amended '369 ANDA, because the FDCA's timing rules do not apply the judgment governing the pre-amendment '369 ANDA containing certifications to the HE patents to an amended ANDA without those certifications.  FDA's regulations likewise expressly permit such carve outs, *see* 21 C.F.R. § 314.94(a)(12)(viii)(A), and lead to the same result:  "[i]mmediate[]" approval, *id.* § 314.107(b)(1)(ii).

Understandably, given these statutory constraints, the Delaware court expressly limited its judgment to only the then-operative, pre-amendment '369 ANDA containing the HE Indication and HE patent certifications.  "The scope of my [the court's] ruling is that the HE patents are not invalid, and that the HE indication would infringe the HE patents.  Norwich's proposed ANDA has the HE indication.  I cannot rule on facts that are not before me"—*i.e.*, whether an amended ANDA lacking the HE Indication would infringe, or, in a subsequent infringement suit, become subject to a delay in its approval.  JA__ (AR44).  The Delaware court also noted whether "Norwich may seek to carve out the HE indication *as permitted by 21 U.S.C. § 355(j)(2)(A)(viii)* is immaterial to this analysis.  That label is *not before me*."  *Id.* (emphasis added).  The Delaware court did not purport to delay approval of an amended ANDA that it expressly refused to consider or rule upon.

In addition to misapplying the statutory and regulatory framework and the judgment itself, FDA's decision conflicts with the purpose and history of the Hatch-Waxman amendments.  Far from requiring an ANDA applicant to start over from scratch by filing a new or distinct ANDA after an adverse patent judgment, as FDA contends here, the FDCA provides that "FDA may approve such a modified label" that carves out the protected method-of-use from an amended label, so as to "speed the introduction of low-cost generic drugs."  *Caraco*, 566 U.S. at 405-06.  FDA's contrary position here flouts Congress's purpose.

The Court should reverse the judgment below, with instructions to grant Norwich summary judgment.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331, because this action arose under the APA, 5 U.S.C. §§ 701-706.  The district court entered an order, JA__-__ (Dkt. 66), and memorandum opinion, JA__-__, __-__ (Dkts. 65, 67), on November 1, 2023, denying Norwich's motion for a preliminary injunction, which the court treated as a motion for summary judgment and consolidated with consideration on the merits, and granting FDA's and Salix's cross-motions for summary judgment.  That order constituted the final judgment of the court.  *See* JA__ (Dkt. 66).  Norwich timely filed a notice of appeal on December 29, 2023.  JA__ (Dkt. 68).  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED

Whether FDA acted contrary to law, or arbitrarily and capriciously, when it concluded that the Delaware court's judgment delaying approval of Norwich's original '369 ANDA containing the HE patent certifications until the expiry date of the HE patents *also* delayed approval of the amended '369 ANDA—which no longer contained the HE patent certifications—until the expiry of the HE patents.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Legal Background

### 1.    Legal Framework for Approval of Generic Drugs

The FDCA generally prohibits the sale of a "new drug" unless it is proven safe and effective.  21 U.S.C. § 355(a)-(b), (d).  Getting one of these "new 'branded' drug[s] to market is a time-consuming process."  *Teva Pharms., USA, Inc. v. Leavitt*, 548 F.3d 103, 104 (D.C. Cir. 2008).  To help recover those costs, a branded drug may be protected from competition for a period of time by, *inter alia*, patents covering the drug, or methods of using the drug, *e.g.*, to treat a given condition.

Congress also recognized the importance of market entry by generic drugs, which "contain[] the same active ingredients but not necessarily the same [inactive ingredients]" as branded drugs.  *Sandoz Inc. v. Becerra*, 57 F.4th 272, 274 (D.C. Cir.

2023) (first alteration in original) (citation omitted). Generics "increase market competition and . . . lower prices for consumers." *Amneal Pharms. LLC v. FDA*, 285 F. Supp. 3d 328, 332 (D.D.C. 2018).

Accordingly, in the Hatch-Waxman Act of 1984, "Congress amended the FDCA to provide a more streamlined path for the approval of generic drugs," *Sandoz*, 57 F.4th at 274, to "expedite the marketing of generic drugs," *Teva*, 548 F.3d at 104 (noting Congress's goal of "fostering competition and lowering drug prices"). Under this statutory regime, generic drug manufacturers may submit ANDAs, relying on the original manufacturer's evidence of safety and efficacy, when the ANDA drug is the "same" as the prior drug, including in its labeling. 21 U.S.C. § 355(j)(2).

### 2. Patent Certifications and Statements

While seeking to promote expedited entry of generic drugs, Congress also recognized that a branded drug may be protected by applicable patents and that entry of the "same" generic drug could infringe those patents. Congress therefore designed a process to "facilitate the approval of generic drugs as soon as patents allow," and thus "speed the introduction of low-cost generic[s]." *Caraco*, 566 U.S. at 405; *see* 21 U.S.C. § 355(j)(5).

"To start the process," an ANDA must include a certification for "each patent" either "claiming a drug for which the applicant is seeking approval" or claiming a

method of using such drug (*e.g.*, a method of using a drug to treat a specific disease or condition). *Teva*, 548 F.3d at 104; *see* 21 U.S.C. § 355(j)(2)(A)(vii).  To identify these relevant patents, the ANDA applicant must consult an FDA publication known as the "Orange Book," which "publishes the [use] codes, patent numbers, and expiration dates" of drug-related patents, as identified by branded drug manufacturers. *Caraco*, 566 U.S. at 405-06.

After consulting the Orange Book, an ANDA applicant files patent certifications—potentially dozens of certifications for dozens of patents—to "assure the FDA that its proposed generic drug will not infringe the brand's patent[s]." *Id.* at 406.  There are four types of certifications:  a "Paragraph I" certification that relevant patent information has not been filed by the branded manufacturer; a "Paragraph II" certification that a relevant patent has already expired; a "Paragraph III" certification that a relevant patent will expire on a specified date in the future; and—most importantly for this case—a "Paragraph IV" certification that a relevant patent is "invalid or will not be infringed" by the manufacture, use, or sale of the generic drug.  21 U.S.C. § 355(j)(2)(A)(vii).

As an alternative to a patent certification, for method-of-use patents, an applicant may "submit a so-called section viii statement" that it "will market the drug" for only those "methods of use not covered by the brand's patent," and propose

a label that "'carves out' . . . the still-patented method(s) of use." *Caraco*, 566 U.S. at 405 (citing 21 U.S.C. § 355(j)(2)(A)(viii); 21 C.F.R. § 314.94(a)(8)(iv)).

### 3.    Paragraph IV Certifications and Patent Litigation

When an applicant files a Paragraph IV certification, it must notify "the patent holder and the company that submitted the [new drug application] on which the ANDA 'piggybacks,'" who may then file a patent-infringement suit. *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 879 (D.C. Cir. 2004) (citing 21 U.S.C. § 355(j)(2)(B)(i), (5)(B)(iii)).

The Patent Act, for its part, was amended as part of the 1984 Hatch Waxman amendments to conform to the amendments to the FDCA.  Since then, the Patent Act has deemed the mere submission (not marketing) of an ANDA "for a drug claimed in a patent or the use of which is claimed in a patent" to be an "act of infringement," 35 U.S.C. § 271(e)(2)(A), and it has provided "the only" remedies for such infringement, *id.* § 271(e)(4).  The first of those exclusive remedies is relevant here.  Under subparagraph (A), "the court shall order the effective date of any approval of the drug . . . involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed." *Id.* Such an order is not an injunction that independently enjoins FDA, since FDA is not a party to the patent suit. *See id.*  Instead, the order gains its force and effect through

11

the FDCA, which instructs FDA to consider the order when applying the FDCA's approval timing rules. *See* 21 U.S.C. § 355(j)(5)(B)(iii).

### 4.    Post-Patent-Litigation Amendments

FDA regulations require that after a patent court finds that a valid patent subject to a certification would be infringed by the ANDA and issues an order delaying approval of that ANDA (from which no further appeal has been or can be taken), the applicant must "submit an amendment to change its [Paragraph IV] certification." 21 C.F.R. § 314.94(a)(12)(viii)(A).

For any infringed, valid patent, the ANDA applicant must amend to either (1) submit a Paragraph III certification, stating that the patent at issue will expire on a specific date, in which case the FDCA's timing rules would make that ANDA approvable upon the patent's expiration, 21 U.S.C. § 355(j)(5)(B)(ii), or (2) in the case of an infringed method-of-use patent, remove the infringing use and replace the Paragraph IV certification with a section viii statement that the ANDA does not seek approval for the approved method of use, *id.* § 355(j)(2)(A)(viii).

This case implicates the latter route, known as an amendment giving rise to a "skinny label" that "carves out" the still-patented method(s) of using the drug. *Caraco*, 566 U.S. at 406. Skinny labeling is a critical part of the generic drug industry, as it ensures that lower cost drugs can be provided to at least the subset of patients for which no relevant patents block approval. *See id.*

12

### 5.    The FDCA's Four Approval Timing Rules

Once (1) all relevant patent litigation is complete and (2) FDA completes its substantive review of an ANDA and determines that it satisfies the scientific criteria for approval, the agency must determine the effective date of approval of the drug. *See* 21 U.S.C. § 355(j)(5)(B).

Specifically, the FDCA provides a baseline rule that ANDAs must be approved within 180 days. *Id.* § 355(j)(5)(A). But when an ANDA contains patent certifications, the statute's timing rules determine the permissible effective date of any approval. These rules allow an otherwise approvable generic drug to be approved after all patent-related obstacles to approval have been removed. *See id.* § 355(j)(5)(B).

The timing rules operate together as a single algorithm, instructing FDA how to determine the earliest approval date of an ANDA when it contains patent certifications. The statute requires FDA to apply the rules to "each [patent] certification" made by the ANDA applicant, to determine the approval date associated with each certification, and to use the latest of those dates as the applicable approval date. *Id.* Specifically: "The approval of an application submitted under paragraph (2) [an ANDA] shall be made effective on the last applicable date determined by applying the following to *each certification made under paragraph (2)(A)(vii)* . . . ." *Id.* (emphasis added).

13

That is, the statute considers *each* of the ANDA applicant's patent certifications, standing alone, in turn, to determine a date associated with that individual certification; and then, among these multiple dates, selects the "last applicable date" as the date the ANDA may be made effective. A simple example illustrates the point: If an ANDA contains 20 patent certifications, the timing rules will produce as many as 20 distinct dates (one per certification); the latest of these 20 dates controls. These timing rules are *how* Congress ensures the "approval of generic drugs as soon as patents allow." *Caraco*, 566 U.S. at 405.

Different rules apply depending on the nature of the patent certification at issue.

**Timing Rule (i):** When there are no relevant patents (a Paragraph I certification) or any relevant patents have expired (a Paragraph II certification), "the approval may be made effective immediately." 21 U.S.C. § 355(j)(5)(B)(i).

**Timing Rule (ii):** When there is a relevant, unexpired, concededly valid patent that will expire in the future (a Paragraph III certification), the approval may be made effective on the date "such patent will expire." *Id.* § 355(j)(5)(B)(ii), (j)(2)(A)(vii)(III).

**Timing Rule (iii):** When there is a dispute over validity or infringement of the relevant patents (a Paragraph IV certification), "the approval shall be made

effective immediately unless," within 45 days, "an action is brought for infringement of the patent that is the subject of the certification." *Id.* § 355(j)(5)(B)(iii).

If the branded drug sponsor timely files a patent infringement action, final approval of the ANDA is also subject to a so-called "30 month stay," during which approval is delayed pending completion of patent litigation. *Id.* Among other possible outcomes of the patent litigation, the court may determine the date upon which the application before it containing the specific Paragraph IV certification under consideration may be approved. *Id.*

**Timing Rule (iv):** An additional timing rule applies when *multiple* ANDA applicants have submitted applications for the same drug containing the *same* Paragraph IV certification. *Id.* § 355(j)(5)(B)(iv). That rule prevents approval of the subsequent ANDA for 180 days after first marketing of the drug by the first generic applicant under certain circumstances. *Id.* This rule is not directly implicated here, because FDA did not evaluate first-applicant exclusivity with respect to the '369 ANDA. (However, Intervenor Salix has argued that 180-day exclusivity would block approval of the '369 ANDA, even if Norwich prevails here. The 180-day exclusivity issue is presented in the related appeal No. 25-5137.)

In contrast to patent certifications, the timing rules do not apply to patent statements. *See* 21 U.S.C. § 355(j)(5)(B). This makes sense, because by definition,

an ANDA cannot include a method of use covered by a patent identified in a patent statement.  *See id.* § 355(j)(2)(A)(viii).

In summary, the following depicts how the timing rules would run on a hypothetical ANDA, containing 3 patent certifications and 1 patent statement:



B.    **Factual Background**

1.    **Rifaximin and Salix's Xifaxan**

Rifaximin is a drug used both to treat IBS-D and to reduce the risk of HE recurrence in adults.  JA__ (AR354).  IBS-D causes abdominal pain and bowel dysfunction, *see* JA__-__ (AR25-29), and affects roughly 3 to 6 percent of people in the United States.[2]

Intervenor Salix markets rifaximin tablets under the brand name Xifaxan and owns or licenses related patents.  *See* JA__-__ (AR34-35).  Despite Salix entering the market with its first rifaximin product over 20 years ago, no generic of rifaximin is available, leaving IBS-D patients with no affordable alternative to Salix's branded, monopoly drug.  *See* JA__ (AR30).  Xifaxan® 550 mg tablets to treat IBS-D, for example, retail for at least $2,210 for a 14-day course of treatment.[3]

2.    **Actavis's ANDA for Rifaximin**

On December 18, 2015, Actavis Laboratories FL, Inc. ("Actavis") submitted an ANDA for rifaximin.  JA__ (AR24).[4]

---

[2]    *See Current and future treatments for IBS-D associated with diarrhea*, Mayo Clinic (Sept. 5, 2015), https://www.mayoclinic.org/medical-professionals/digestive-diseases/news/current-and-future-treatments-for-ibs-d/mac-20429499.

[3]    GoodRx, Xifaxan, https://www.goodrx.com/xifaxan?form=tablet&dosage=550mg&quantity=42&label_override=xifaxan (last visited June 11, 2025).

[4]    Intervenor Teva in the related case No. 25-5137 later acquired Actavis.

Actavis's ANDA was the first ANDA submitted referencing Xifaxan (*i.e.*, relying on Salix's Xifaxan to show safety and efficacy), and it contained Paragraph IV certifications to patents associated with rifaximin, including patents for the treatment of IBS-D and HE. *See id.* FDA thus deems Actavis the generic "first applicant" for generic rifaximin. *See id.*; 21 U.S.C. § 355(j)(5)(B)(iv).

In September 2018, Actavis settled ongoing patent litigation with Salix over rifaximin. Press Release, Bausch Health, *Bausch Health Announces Resolution Of XIFAXAN® Intellectual Property Litigation* (Sept. 12, 2018), https://ir.bauschhealth.com/news-releases/2018/09-12-2018-120152669. Actavis abandoned its patent challenges, and, in return, received a royalty-free license, effective on January 1, 2028, to market its ANDA product (if approved) or launch an "authorized generic." *Id.*[5] That is, Actavis agreed to not enter the market for *more than 12 years* after filing its ANDA (with a conditional right for accelerated market entry if another generic applicant obtained final approval and launched its ANDA product earlier). Actavis's ANDA still has not received final approval from FDA, almost a decade since it was originally filed, and notwithstanding FDA's default 180-day approval deadline. *See* JA__ (AR24).

---

[5]    An "authorized generic" is not a true generic drug, but rather, a licensed version of the branded drug. *See Sanofi-Aventis v. Apotex Inc.*, 659 F.3d 1171, 1174 (Fed. Cir. 2011).

Salix and Actavis take the position in appeal No. 25-5137 that because Actavis was the "first applicant," no other ANDA, including Norwich's ANDAs, can be approved, until Actavis enters the market, *i.e.*, in or after mid-2028. Commenters and courts have widely condemned such agreements, in which an ANDA first-applicant like Actavis attempts to "park" its 180-day exclusivity for years—here, over a decade—and prevents all competitive ANDA entry. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 156, 158 (2013) (explaining that 180-day exclusivity "create[s] special incentives for collusion" between the generic first applicant and branded sponsor and a "risk of significant anticompetitive effects"). Such settlements plague the pharmaceutical industry and contribute to higher drug costs. *See id.*

### 3.    Norwich's ANDA No. 214,369 and the Delaware Judgment

Norwich has been working to bring generic rifaximin for IBS-D to market for more than five years. In December 2019, Norwich submitted the '369 ANDA for generic rifaximin 550 mg tablets. JA__ (Dkt. 4-3 at 3).

The original '369 ANDA sought authorization to treat both IBS-D and HE. *Id.* Norwich included Paragraph IV certifications to Salix's patents that Salix identified in the Orange Book as relevant to rifaximin, taking the position that those patents were invalid and/or not infringed. JA__-__ (Dkt. 4-3 at 3-4). Salix timely filed a patent infringement action against Norwich in federal court in Delaware,

alleging the '369 ANDA infringed those patents in Norwich's certifications.  JA__-__ (AR155-203).

The Delaware court ruled that, as a general matter, Salix's contested patents were invalid, *except* that certain claims of the HE patents were infringed by the then-operative '369 ANDA containing the HE Indication and not invalid.[6]   Under 35 U.S.C. § 271(e)(4)(A), the Delaware court therefore ordered that "the effective date of any final approval by [FDA] of Norwich's ANDA No. 214369 is to be a date not earlier than the date of expiration of the last to expire of the '573, '195, and '397 [HE] Patents (currently October 2, 2029)."  JA__ (AR42).

Prior to entry of that judgment, the parties disputed the text of the court's proposed judgment.  *See '369 Infringement Case* Dkts. 190, 196.  Specifically, the parties disputed whether the final judgment ought to set the approval date for (i) "Norwich's ANDA No. 214369" or (ii) "Norwich's ANDA with proposed labeling containing [the HE Indication]."  *See* JA__ (AR43).  The Delaware court entered the former judgment, and issued a companion order the same day explaining that it was "entering a final judgment in accordance with the following rationale."  *Id.*  The court explained that it delayed approval of the operative '369 ANDA that

---

[6]   JA__-__ (AR41-42, 43-45); *see also* Trial Op., *Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, No. 1:20-cv-430 (D. Del. Aug. 10, 2022), Dkt. 191 ("*369 Infringement Case*").

had been litigated, because it included the infringing HE Indication.  JA__-__
(AR43-45).  The Patent Act provides that a court "shall order the effective date of
any approval of the drug . . . *involved in the infringement* to be a date which is not
earlier than the date of the expiration of the patent which has been infringed."  JA__
(AR44) (alteration in original) (emphasis added) (quoting 35 U.S.C. § 271(e)(4)).
"Thus," the Delaware court explained, "the effective date of the approval of *this
infringing ANDA* must not be earlier than the expiration of the latest asserted HE
claim."  *Id.* (emphasis added).

The Delaware court noted that its judgment was not considering or delaying
the approval any future, amended version of the ANDA not before the court, which
might or might not infringe.  *Id.*  Instead, "[t]he scope of my ruling is that the HE
patents are not invalid, and that the HE indication would infringe the HE patents.
Norwich's proposed ANDA has the HE indication.  I cannot rule on facts that are
not before me," *i.e.*, regarding a hypothetical amended ANDA and label that omits
the HE indication and HE patent certifications.  *Id.*

The Delaware court noted that Norwich might subsequently amend its ANDA
to remove the HE Indication, and explained that the court did not consider—much
less rule upon—any hypothetical amended ANDA omitting the HE indication:
"That Norwich may seek to carve out the HE indication as permitted by 21 U.S.C.
§ 355(j)(2)(A)(viii) is immaterial to this analysis.  That label is not before me."  *Id.*

21

The court noted that the statute "permitted" such a "carve out"; it did not suggest the judgment nonetheless barred approval of an amendment.  *Id.*

### 4. Post-Judgment Proceedings on Norwich's ANDA No. 214,369

Following the Delaware court's judgment, and consistent with FDA regulations, *see* 21 C.F.R. § 314.94(a)(12)(viii), Norwich amended the '369 ANDA by removing the HE Indication from its label and withdrawing the Paragraph IV certification to each HE patent.  JA__-__ (AR301-03).  That is, Norwich "carved out" the HE Indication, and converted the HE patent certifications to patent statements.  *See generally Caraco*, 566 U.S. at 406 (describing this "carve-out" process).  Norwich's patent statements explained it sought approval for the drug only for those "methods of use not covered by the brand's patent," *i.e.*, the treatment of IBS-D.  *Id.*; *see also* JA__ (AR367-68) (discussing patent statements).  FDA at no time suggested that the amended label *did* seek approval for the HE Indication covered by Salix's HE patents, and Salix has never claimed the amended ANDA infringes the HE patents, either.

After this amendment, Norwich requested to amend the Delaware court's judgment under Federal Rule of Civil Procedure 60, to make explicit that the judgment did not preclude FDA from approving Norwich's amended '369 ANDA now that the application did not seek approval for the HE Indication.  JA__ (AR363).  Norwich requested that the court "limit[] the order under Section 271(e)(4)(A) that

is blocking the approval of Norwich's ANDA until the expiration of the Asserted HE Patents directed to hepatic encephalopathy."  JA__ (AR269) (footnote omitted). Federal Rule of Civil Procedure 60 provides limited grounds to alter a judgment, including "newly discovered evidence," "fraud," or a showing that "the judgment has been satisfied, released, or discharged" or that "applying it prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(2)-(3), (5).  The Delaware court denied Norwich's motion, refusing to consider the amendment of the '369 ANDA or any impact the amendment might have on the prior judgment.  The court stated that the amendment had not been raised during earlier litigation and there was no basis to consider it after judgment had been entered.  JA__-__ (AR358-62).

In denying the motion, the Delaware court emphasized that it refused to rule on the amended '369 ANDA in any way:  "Defendant filed an ANDA seeking to make and market a drug for two different methods of treatment—the IBS-D indication *and the HE indication*," and the court ordered that the ANDA could not be approved "before the latest expiration (in about 2029) of the [HE] patents on which Plaintiffs won."  JA__-__ (AR358-59) (emphasis added).  The amended ANDA omitting the HE indication was simply a "new issue after judgment" that would require "a second litigation" if there remained relevant patent issues.  JA__ (AR361).

The Delaware court explained that considering or ruling on the amended ANDA after trial "seems wrong" because it would allow Norwich to obtain a judgment "based on a particular ANDA, and then, after final judgment, change the ANDA to what it wishes it had started with and win *in a summary proceeding*" in which the only "evidence" before the court was a revised label for the drug. JA__ (AR362) (emphasis added). The court refused to engage in that summary proceeding—or any proceeding at all—considering or ruling on the amended '369 ANDA. *Id.*

The Delaware court also dismissed the argument that the judgment would mean no "generic competition . . . on the IBS-D treatment method for some period of time." JA__ (AR360-61). The court found that argument "speculative, since there is *no information* about if or when the FDA might approve the amended ANDA" with distinct patent certifications. JA__ (AR361) (emphasis added). The court did not believe FDA would delay approval of the amended ANDA until 2029, given the Court had "no information" about a potential approval date. *Id.*

As further detailed below, both parties appealed to the Federal Circuit. *'369 Infringement Case* Dkts. 198, 223.

### 5.    FDA's Tentative Approval Decision

Subsequent to the Delaware court's rulings, FDA granted only tentative approval to the amended ANDA lacking the HE Indication. JA__ (AR365-70).

24

Tentative approval is not a final, effective approval, but instead means that some legal obstacle prevents final approval of an otherwise approvable ANDA. *See* 21 C.F.R. § 314.105(d); *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1311 (D.C. Cir. 2010) (explaining that tentative approval is "final approval with a delayed effective date").

FDA stated in its tentative approval decision that "final approval cannot be granted until October 2, 2029 as specified in the [Delaware] court order." JA__ (AR367). Still, in the very next paragraph, FDA acknowledged that Norwich's amended ANDA differed from the original ANDA on which the Delaware court ruled: As permitted by FDA's regulations, the amended ANDA contained section viii statements carving out the HE patents that were the basis of the Delaware court's infringement determination. JA__ (AR367-68). As FDA explained, "these are method-of-use patents that do not claim any indication for which you are seeking approval under your ANDA." *Id.* Yet FDA withheld final approval of the ANDA. *Id.* That is, notwithstanding the FDCA's timing rules, FDA read the Delaware judgment to block approval of any Norwich ANDA containing the number 214,369, no matter its form, contents, or certifications therein. *See id.*

### C.    Procedural Background

#### 1.    The APA Action Below and Decision Under Review

Norwich challenged FDA's refusal to grant final approval to the '369 ANDA in the district court below as contrary to law and arbitrary and capricious under the APA.  JA__-__ (Dkt. 1).

At the parties' request and agreement, the district court consolidated consideration of Norwich's motion for preliminary injunction with the parties' summary-judgment motions.  JA__-__ (June 18, 2023 Minute Order).  The court then granted FDA's and Salix's cross-motions for summary judgment and held that FDA had not erred in concluding that the Delaware court's judgment delayed approval of the amended '369 ANDA until 2029.  JA__-__, __-__ (Dkts. 65, 67).  While acknowledging that "Norwich raise[d] a substantial argument" challenging FDA's determination, the court rejected it.  JA__ (Dkt. 67 at 34).  The court reasoned that "Norwich's ANDA, even as amended, is still ANDA No. 214369," so any amendment fell within the "plain-language" of the Delaware court's judgment.  JA__ (Dkt. 67 at 30).

The district court found that Norwich "would have been on stronger footing" had there been no Rule 60 motion to alter the judgment.  JA__ (Dkt. 67 at 31).  The Delaware court's Rule 60 order, according to the district court, considered and rejected Norwich's argument about its amended ANDA.  JA__ (Dkt. 67 at 32).  The

district court found that the Rule 60 order supported the view that patent courts need not "invariably[] carve out from their judgments any future, amended ANDAs that are limited in scope to those methods-of-use that were not found to be infringing at trial." JA__ (Dkt. 67 at 37). Norwich timely appealed, JA__ (Dkt. 68), and at Norwich's request, this Court held that appeal in abeyance pending exhaustion on any appeals of the Delaware judgment, Doc. 2058953.

### 2. The Federal Circuit's Decision

Subsequently, the Federal Circuit affirmed both the Delaware court's judgment and order denying the Rule 60 motion, while emphasizing their limited scope.

As to the judgment, the Federal Circuit explained that the amended '369 ANDA—which removed the HE Indication from the label—was not considered or ruled upon by the Delaware court. Consistent with the FDCA's approval timing rules, the Federal Circuit explained that a patent court's § 271(e)(4) order sets an approval date "not earlier than the date of the expiration of the patent which has been infringed" as to the "approval of the drug . . . *involved in the infringement*." *Salix Pharms., Ltd. v. Norwich Pharms. Inc.*, 98 F.4th 1056, 1067-68 (Fed. Cir. 2024) (emphasis added) (quoting 35 U.S.C. § 271(e)(4)). Because § 271(e)(4) restricts only infringing uses of a drug identified in a patent certification, the Federal Circuit found that the judgment could delay approval only of "the *specific ANDA* in question

27

*that included an infringing use*," *i.e.*, the HE Indication and related HE patent certifications. *Id.* at 1068 (emphasis added).

The Federal Circuit accordingly agreed with the Delaware court that addressing "whether an ANDA applicant has successfully carved out language from a label to turn infringement into non-infringement" by amendment would effectively require a "second litigation," and appropriately had not been addressed by the Delaware court's judgment. *Id.* (citation omitted). The Federal Circuit also affirmed that the Delaware court's "order appropriately said nothing that would prevent approval of a new non-infringing ANDA," since the judgment could only prevent "approval of particular infringing uses of the drug," *i.e.*, approval of the operative ANDA containing the HE Indication and related HE patent certifications, "not all uses of the drug including non-infringing uses" unrelated to the HE Indication. *Id.*

The Federal Circuit also affirmed the Delaware court's denial of Norwich's motion to alter or amend the judgment. Emphasizing the exacting standard to alter a judgment under Rule 60, the Federal Circuit found that "the court reasonably held that consideration of the amended ANDA would be inequitable and inappropriate." *Id.* at 1068-69. It thus affirmed the lower court's decision not to consider, much less rule upon, the amended ANDA. *See id.*

### 3.    Norwich's ANDA No. 214,370 and Related Litigation

In December 2019, Norwich submitted ANDA No. 214,370 for rifaximin tablets, 200 mg ("the '370 ANDA"). *Norwich Pharms., Inc. v. Kennedy*, No. 25-cv-91, 2025 WL 1148463, at \*6 (D.D.C. Apr. 18, 2025).

In May 2024, after the Federal Circuit's decision, Norwich submitted to FDA a new dosage strength amendment to the '370 ANDA for rifaximin tablets, adding rifaximin tablets, 550 mg, for the IBS-D Indication. *Id.* at \*7. The rifaximin tablets, 550 mg, now specified in the '370 ANDA effectively mirror the product and label specified in the amended '369 ANDA. Administrative Record 823-24, *Norwich Pharms., Inc. v. Kennedy*, No. 25-cv-91 (D.D.C. Mar. 28, 2025), Dkt. 79. Unlike the '369 ANDA, there has not been relevant patent litigation triggering a 30-month stay of approval of the '370 ANDA (though there is pending litigation in New Jersey as to two later-filed patents that did not trigger a stay, *see Salix Pharms., Inc. v. Norwich Pharms., Inc.*, No. 1:24-cv-7140 (D.N.J. filed June 20, 2024)).

FDA determined in January 2025 that the '370 ANDA cannot be finally approved because the generic first applicant—Actavis—had not forfeited its 180-day exclusivity for rifaximin for the IBS-D Indication. *Norwich*, 2025 WL 1148463, at \*8-9. The lower court upheld FDA's decision on April 18, 2025, *id.* at \*18, and Norwich's appeal of the district court's decision is pending in appeal No. 25-5137, which on May 21, 2025 was set for oral argument before the same panel as this case.

## STANDARD OF REVIEW

The Court reviews a district court's grant of summary judgment in a case concerning agency action *de novo*. *Thaler v. Perlmutter*, 130 F.4th 1039, 1044 (D.C. Cir. 2025). Under the APA, FDA's tentative approval decision must be set aside if it is arbitrary, capricious, or contrary to law. 5 U.S.C. § 706(2)(A).

## SUMMARY OF ARGUMENT

Approval of the amended '369 ANDA is not blocked by the Delaware court's judgment.

I. Because the amended '369 ANDA lacks any certification to the HE patents, the Delaware court's judgment arising from those patents does not delay the approval date of the amended ANDA.

A. Congress gave FDA a narrow and specific task with respect to patent judgments: Apply those judgments, where applicable, to a set of prescribed statutory rules. Those statutory rules inform how FDA should have read and then applied the Delaware judgment when deciding the approvability of Norwich's amended ANDA. The statute makes clear that an order under § 271(e)(4) of the Patent Act directed to a pre-amendment ANDA does not delay approval of an amended ANDA with distinct patent certifications, and FDA erred in concluding otherwise. Section 355(j)(5)(B) of the FDCA provides that the approval date of an ANDA shall be determined by applying timing rules to "each certification made" by the applicant in

30

an "application submitted" under § 355(j).  Here, Norwich's amended '369 ANDA does not contain any "certification made" to the HE patents, *i.e.*, the patents that gave rise to the § 271(e)(4) order delaying approval of the then-operative '369 ANDA containing the HE Indication.  FDA therefore erred by reading the § 271(e)(4) order delaying approval of the then-operative '369 ANDA to also delay approval of the amended '369 ANDA lacking the HE patent certifications.

B.  FDA's reading and application of the judgment must be informed not only by the statute, but by its duly promulgated regulations.  Those regulations also make clear FDA could not refuse immediate approval of Norwich's amended ANDA based on a prior judgment directed to the pre-amendment ANDA containing distinct certifications; instead, the amended ANDA was approvable "[i]mmediately."  21 C.F.R. § 314.107(b)(1)(ii); *see also id.* § 314.94(a)(12)(viii)(A) (permitting "carve out").

C.  Simply reading the Delaware court's judgment and its accompanying explanatory order makes plain that the Delaware court conformed to, rather than attempted to violate, the statutory and regulatory requirements detailed above.  The Delaware court did so by appropriately limiting its judgment to the pre-amendment ANDA presented to, and ruled upon by the Delaware court, not a then-hypothetical amended ANDA lacking the HE Indication and HE patent certifications.

31

D.  The district court found that a post-judgment order denying a Rule 60 motion, which had asked the Delaware court to consider for the first time the amended '369 ANDA after judgment, meant the earlier judgment should be read to delay approval of the amended '369 ANDA.  But in denying the Rule 60 motion, the Delaware court refused to consider the amended ANDA, much less rule that the approval date for the amended ANDA should be delayed.

II.  Any other conclusion would conflict with not just the text of the FDCA, FDA's regulations, and the Delaware court's judgment, but with the purpose and history of the Hatch-Waxman amendments, which were intended "to enable competitors to bring cheaper, generic . . . drugs to market as quickly as possible." *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1344 (Fed. Cir. 2007) (alteration in original) (citation omitted).

## ARGUMENT

In the decision under review, FDA refused immediate approval of the amended '369 ANDA, even when it lacked certifications to the HE patents that gave rise to the Delaware judgment.  FDA's overbroad interpretation and application of the judgment is inconsistent with the FDCA, FDA's own regulations, and the judgment itself.  It also flouts the purpose and history of the Hatch-Waxman Act. Accordingly, FDA's decision was contrary to law and arbitrary and capricious.

I.     **THE DELAWARE JUDGMENT DELAYING APPROVAL OF THE ORIGINAL '369 ANDA DOES NOT DELAY APPROVAL OF THE AMENDED '369 ANDA**

FDA's approval of the amended '369 ANDA is not delayed by the prior Delaware judgment.

Congress instructed FDA to apply patent judgments in a specific statutory context.  FDA should have read and applied the Delaware judgment in the precise manner prescribed by FDA's enabling statute and implementing regulations.  Here, the statutory text, the regulatory text, and text of the judgment all demonstrate that the Delaware judgment delaying approval of "Norwich's ANDA No. 214369" solely delayed approval of the ANDA that was operative, considered, and ruled upon by the Delaware court, not a hypothetical amended ANDA that the Delaware court refused to consider.

A.     **The Text and Structure of the FDCA Makes Clear that a § 271(e)(4) Order, Read in Context, Does Not Delay Approval of an Amended ANDA with Distinct Patent Certifications**

Congress did not task FDA with reviewing patent judgments in the abstract, but rather with applying such judgments pursuant to a specific set of prescribed statutory rules.  *See Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 912 (D.C. Cir. 2024) (explaining that because agencies are creatures of statute, they "literally ha[ve] no power to act except to the extent Congress authorized them" (quotation omitted)).  The FDCA instructs FDA to determine the effective date of an ANDA's approval

33

based on the patent certifications made in the ANDA before it—not a hypothetical or superseded ANDA.  If one of the patent certifications in the ANDA before FDA gave rise to a patent judgment finding infringement of that patent, that certification sets an effective date for the application containing it, and that date controls.  If the application contains no such patent certification, however, the FDCA does not permit FDA to delay approval based on a judgment arising from a non-certified patent.

In the Hatch-Waxman amendments, Congress enacted § 355(j)(5)(B) of the FDCA and § 271(e)(4) of the Patent Act to work together hand-in-hand.  *See* 21 U.S.C. § 355(j)(5)(B)(iii)(II)(bb) (making approval of ANDA containing Paragraph IV certification dependent on "the date specified by the district court in a court order under section 271(e)(4)(A) of [t]itle 35"); 35 U.S.C. § 271(e)(2), (e)(4) (providing for an order delaying the "effective date" of approval of a drug "involved in the infringement" in an ANDA submitted "under section 505(j) of the [FDCA]").  Unlike an injunction, a § 271(e)(4) order does not directly bind FDA in equity.  (Injunctions can bind only parties and those in privity with them, Fed. R. Civ. P. 65(d)(2), and FDA was not such a party in the Delaware proceeding.)  Instead, a § 271(e)(4) "resetting order" that delays the approval of an ANDA gains its force and effect only if applied by FDA under the approval timing rules in § 355(j)(5)(B)

of the FDCA. *See Ferring B.V. v. Watson Laboratories, Inc.*, 764 F.3d 1401, 1406 (Fed. Cir. 2014) (distinguishing "resetting order" from "injunction").

Section 355(j)(5)(B) provides that the "approval of an application [*i.e.*, ANDA] . . . shall be made effective on the last applicable date determined by applying the following to *each certification made* under paragraph (2)(A)(vii)." 21 U.S.C. § 355(j)(5)(B) (emphasis added). That is, the universe of relevant patent certifications that determine the effective date for "approval of an application" is limited solely to "each certification made" by Norwich in its operative ANDA. *Id.*

When an applicant makes a Paragraph IV certification to a patent in a given ANDA, if the patent court "decides that the patent has been infringed" and that judgment is affirmed, when FDA runs the timing rules "the approval shall be made effective on the date specified by the [patent] court in a court order under section 271(e)(4)(A) of [t]itle 35." *Id.* § 355(j)(5)(B)(iii)(II). In other words, the "approval" that shall be "made effective" on the date specified by the court is the "*approval* of an *application submitted* under paragraph (2)," *i.e.*, the then-operative ANDA that has been "submitted" at the time of the court's order. *Id.* § 355(j)(5)(B) (emphasis added). As a result, a § 271(e)(4) order can delay approval of only an application that contains a specific patent certification to a specific patent held to be valid and infringed. *Id.* § 355(j)(5)(B)(iii). That limitation in the FDCA is symmetrical with the parallel limitation in the Patent Act, providing that a

35

§ 271(e)(4) order can only delay the "effective date" of approval of a drug "*involved in the infringement*" in an ANDA previously submitted to FDA with infringing certifications "under section 505(j) of the [FDCA]."  35 U.S.C. § 271(e)(2), (e)(4).

By the time that FDA made its tentative approval decision in this case, Norwich had, as permitted by FDA regulations, replaced its Paragraph IV certifications with respect to the HE patents with a patent statement that the amended ANDA did *not* seek approval for any use relevant to the HE patents.  21 C.F.R. § 314.94(a)(12)(viii)(A) (authorizing "amendment" that converts Paragraph IV certification to Paragraph III certification or patent statement of non-infringement following a judgment of infringement); JA__-__ (AR367-68).  So FDA needed to run through the four statutory timing rules as to *each patent certification* in Norwich's then-operative *amended* '369 ANDA.  21 U.S.C. § 355(j)(5)(B).  FDA considered each of the certifications in the amended ANDA in its tentative approval letter and acknowledged that Norwich's amended ANDA "contains" section viii statements as to the HE patents "that do not claim any indication for which you are seeking approval under your ANDA."  JA__ (AR367-68).  That is, FDA agreed Norwich did not seek approval in the amended ANDA for the HE Indication subject to the HE patents and prior HE patent certifications.  Yet, FDA concluded that the Delaware court's judgment with respect to infringement of the HE patents—

triggered by the earlier HE patent certifications—also blocked approval of the amended ANDA lacking those patent certifications.

That was error. When FDA ran the four timing rules on the amended ANDA, it should have marched through the rules for "each certification made under paragraph (2)(A)(vii)" in the amended ANDA before it. 21 U.S.C. § 355(j)(5)(B). Had FDA done that, it would have found that: (1) Norwich did not make only Paragraph II certifications; (2) each remaining Paragraph IV certification (*e.g.*, with respect to the IBS-D patents) resulted in an effective date of August 10, 2022, when the Delaware court entered judgment on the associated patents; and (3) the section viii statements as to the HE patents were not "certification[s] made under paragraph (2)(A)(vii)" that would be considered under the four timing rules. *See id.* § 355(j)(5)(B)(i), (iii)(I)(aa); JA__-__ (AR55-58). Thus, the "last applicable date" under the relevant timing rules was August 10, 2022. *See* 21 U.S.C. § 355(j)(5)(B).

The HE patents are not contained in the amended '369 ANDA and therefore should not have been part of the timing analysis when FDA made its approval decision. *See id.* Reading the patent judgment in the context of Congress's statutory requirements, the prior judgment simply bears on infringing certifications that are no longer part of the amended ANDA. That judgment remains highly relevant—FDA could not have approved the '369 ANDA with an HE patent certification, preserving Salix's monopoly over the HE Indication for now. But FDA went astray

by applying that judgment more broadly to also preclude approval of the then-operative ANDA actually before it, which did not seek approval for the HE Indication and lacked certifications to the HE patents.

### B. FDA's Binding Regulations Also Make Clear that a § 271(e)(4) Order, Read in Context, Does Not Delay Approval of an Amended ANDA with Distinct Patent Certifications

FDA's application of the judgment must be informed not only by the statute, but also its duly promulgated regulations. *See Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (It is "axiomatic" that an "agency is bound by its own regulations."). Those regulations also make clear that FDA could not refuse immediate approval of Norwich's amended ANDA based on a prior judgment directed to the pre-amendment ANDA containing distinct certifications; instead, the amended ANDA was immediately approvable.

ANDA applicants are expressly permitted under the regulations to omit from their ANDAs an indication included in the branded listed drug's label: A permissible "difference[] between the applicant's proposed labeling and labeling approved for the reference listed drug may include . . . omission of an indication or other aspect of labeling protected by patent." 21 C.F.R. § 314.94(a)(8)(iv). In other words, an ANDA applicant can pursue a "skinny label" that "'carves out' from the brand's approved label the still-patented methods of use." *Caraco Pharm. Laboratories, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 406 (2012).

Indeed, once the Delaware court found that Norwich's original ANDA infringed the HE patents, FDA's regulations permitted Norwich to amend its ANDA to either (i) provide an appropriate patent certification conceding the validity and application of those HE patents—in which case the amended ANDA could not be approved until the HE patents expired—or, (ii) remove ("carve out") the infringing use, the HE Indication, from its application and provide an appropriate patent statement that the application no longer sought approval for the HE patents' protected method of use. *See* 21 C.F.R. § 314.94(a)(12)(viii)(A) (providing that, following a finding of infringement, an applicant shall provide a Paragraph III certification, or, "with respect to a patent claiming a method of use, the applicant may instead provide a [patent] statement . . . if the applicant amends its ANDA such that the applicant is no longer seeking approval for a method of use claimed by the patent"); *see also id.* § 314.94(a)(12)(viii) (permitting amendments to patent certifications).

Here, Norwich chose to remove the infringing HE Indication from its label and submitted a section viii statement. JA__-__ (AR55-58). Once it did so, FDA's regulations should have dictated the legal consequences and the effect of the Delaware judgment: "Once an amendment for the change has been submitted, the ANDA will no longer be considered to contain a paragraph IV certification to the patent." 21 C.F.R. § 314.94(a)(12)(viii)(A); *see also id.* § 314.94(a)(12)(viii)

(similar).  And because Norwich "submit[ted] an appropriate [section viii statement] explaining that a method-of-use patent does not claim an indication or other condition of use for which the applicant is seeking approval," the amended ANDA should have become approvable "[i]mmediately."  *Id.* § 314.107(b)(1)(ii); *see also* 81 Fed. Reg. 69,580, 69,624 (Oct. 6, 2016) (same).

FDA recognized that Norwich successfully carved out the HE Indication, but then faltered at the last step.  As FDA correctly explained, Norwich's amended ANDA contained section viii statements that the HE patents covering the HE Indication "are method-of-use patents that do not claim any indication for which you are seeking approval under your ANDA."  JA__-__ (AR367-68).  FDA should have then concluded that the application could be made effective "[i]mmediately."  21 C.F.R. § 314.107(b)(1)(ii).  Instead, it read the Delaware judgment as precluding approval until the date of expiration of the last-to-expire of the HE patents (October 2, 2029), even though the infringing use addressed in that judgment was no longer in the amended ANDA and its patent certifications.  That, too, was error.

## C.    The Delaware Court's Judgment Did Not Purport to Delay Approval of an Amended ANDA Never Considered or Ruled upon by that Court

FDA further erred by simply misreading the Delaware court's judgment.  That judgment and its accompanying explanatory order make plain that the Delaware court conformed to, rather than attempted to violate, the statutory and regulatory

40

requirements detailed above.  The Delaware court did so by appropriately limiting its judgment to the pre-amendment ANDA before it, which included the HE Indication and HE patent certifications.  The judgment did not rule on a hypothetical ANDA without the HE patent certifications—indeed, the court refused to do so. FDA erroneously expanded the scope of the court's judgment when it read the judgment to control the effective date for the amended ANDA without those certifications.

To be sure, there could theoretically be a case where a patent court could grossly err—for example, entering a § 271(e)(4) order that "FDA may never grant approval to any ANDA filed by this applicant at any time in the future"—that would raise difficult questions of whether FDA could or must disregard the patent court's order as yielding to Congress's statutory framework.  But this is not such a case. Norwich conceded below that it did not challenge the lawfulness of the Delaware judgment, an issue reserved to the Federal Circuit.  *See* JA__-__ (Dkt. 67 at 38-39). But that judgment just does not say, or do, what either FDA or the district court thought that it did.  Rather, the Delaware court limited its judgment to only the then-operative, pre-amendment '369 ANDA containing the HE patent certifications.

The interpretation of a "judgment is considered a conclusion of law subject to *de novo* review."  *McKenzie County v. United States*, 131 F.4th 877, 888 (8th Cir. 2025) (citation omitted); *id.* at 888-89 (collecting cases); *accord Nix v. Billington*,

448 F.3d 411, 414 (D.C. Cir. 2006) (suggesting, but declining to decide, that "interpretation of orders drafted by a different judge" is reviewed "*de novo*").  Courts "construe a judgment so as to give effect to the intention of the court" "'with reference to the issues it was meant to decide.'"  *McKenzie*, 131 F.4th at 889-90 (citation omitted); *see also United States v. Spallone*, 399 F.3d 415, 424 (2d Cir. 2005) (same); *Nix*, 448 F.3d at 414 (similar).  And these principles should carry special force where, as here, the court's judgment does not arise from its inherent powers or common law, but from a reticulated statutory scheme.  *See Spallone*, 399 F.3d at 424-26 (construing judgment arising from, and in accordance with, statutory scheme); *McKenzie*, 131 F.4th at 890 (same); *cf. Nix*, 448 F.3d at 414 (interpreting meaning of order in context of prior case scheduling order).  That is, courts interpret another court's order with the presumption that it intended to conform to, not violate, the statute that authorized that order.  *See Spallone*, 399 F.3d at 424-26.

The Delaware judgment provides that:

> Pursuant to 35 U.S.C. § 271(e)(4)(A), it is hereby ordered that the effective date of any final approval by the Food and Drug Administration ("FDA") of Norwich's ANDA No. 214369 is to be a date not earlier than the date of expiration of the last to expire of the '573, '195, and '397 [HE Indication] Patents (currently October 2, 2029) . . . .

JA__ (AR42).  On August 10, 2022, the same day as that judgment, the Delaware court entered an accompanying order, providing the "rationale" for the judgment.  JA__ (AR43).  The court explained that the parties disputed whether "the final

42

judgment ought to order the FDA approval date for 'Norwich's ANDA No. 214369'
or 'Norwich's ANDA with proposed labeling containing [the HE indication]' as the
expiry date of the HE patents." *Id.* (alteration in original) (citation omitted).  The
court adopted the former judgment.  JA__ (AR42).  That is because the Patent Act
provides that a court "shall order the effective date of any approval of the drug . . .
*involved in the infringement* to be a date which is not earlier than the date of the
expiration of the patent which has been infringed."  35 U.S.C. § 271(e)(4)(A)
(emphasis added).  The Delaware court explained that this statutory text dictated the
judgment as related to the then-operative, pre-amendment ANDA:  "the effective
date of the approval of *this infringing ANDA* must not be earlier than the expiration
of the latest asserted HE claim."  JA__ (AR44) (emphasis added).

The Delaware court made clear that its judgment was not considering, much
less delaying the approval any future, amended version of the ANDA not before the
court:

> The scope of my ruling is that the HE patents are not invalid, and that
> *the HE indication would infringe the HE patents.  Norwich's proposed
> ANDA has the HE indication.  I cannot rule on facts that are not before
> me* [regarding a revised ANDA and label].  That Norwich may seek to
> carve out the HE indication *as permitted by 21 U.S.C.
> § 355(j)(2)(A)(viii)* is immaterial to this analysis.  *That label is not
> before me*.

*Id.* (emphases added).

Breaking this down:  Because "Norwich's proposed ANDA has the HE

indication," the Court found that "*this infringing ANDA* must not be earlier than the expiration of the latest asserted HE claim." *Id.* (emphasis added). So the delay to "this infringing ANDA" necessarily means the then-operative ANDA that "has the HE indication"; it did not opine on a hypothetical future ANDA, which might or might not infringe. *Id.* Next, the court explained that Norwich was *permitted*, in the future, to "seek to carve out the HE indication," *i.e.*, to remove the HE Indication from any hypothetical, amended ANDA's label, as "permitted" by the statute. *Id.* The Delaware court refused to rule on the approval date of any amended ANDA permitted by the FDCA, because "[t]hat label is not before me." *Id.*

Notably, Intervenor Salix indicated that it too believed the judgment addressed the "current ANDA" (which included the HE Indication) and not other hypothetical ANDAs without the HE Indication. Salix emphasized that "the parties never litigated the issue of what a future, hypothetical 'skinny' label would look like, and whether it would infringe the Asserted HE Patents." *'369 Infringement Case*, Dkt. 196 at 2. Salix further noted that such a dispute would require, among other things, "discovery" and further proceedings—none of which occurred. *Id.* at 1.

Despite this history, the district court determined that the "plain text" of the Delaware court's judgment supported FDA's decision. JA__ (Dkt. 67 at 30). Yes, the Delaware court did refer to delaying "ANDA No. 214369" until the expiration of the HE patents in 2029. And for that reason, Norwich was concerned at the time

44

that the judgment could be perceived as over-broad, and used by Salix to make mischief in the future (as it has done), thus leading Norwich to seek a modified, narrower judgment. But a court "must interpret [an] order 'with reference to the issues it was meant to decide.'" *McKenzie*, 131 F.4th at 890 (quoting *Mayor & Aldermen of Vicksburg v. Henson*, 231 U.S. 259, 269 (1913)); *Spallone*, 399 F.3d at 424 (same); *Nix*, 448 F.3d at 414 (similar, interpreting meaning of order in context of prior proceedings before that court). Here, the only issue the Delaware court meant to decide was, consistent with the statutory scheme giving rise to the order itself, the approval date of the then-operative ANDA with specific HE patent certifications that gave rise to the infringement. JA__ (AR44) ("Norwich's proposed ANDA has the HE indication. I cannot rule on facts that are not before me.").

Notably, the Federal Circuit read the Delaware court's judgment the same way. *Salix Pharms., Ltd. v. Norwich Pharms. Inc.*, 98 F.4th 1056, 1068 (Fed. Cir. 2024). The Federal Circuit explained that the Delaware judgment "restrict[ed] final approval of the *entire ANDA*, *including the non-infringing indication [and HE Indication]*, until 2029." *Id.* (emphasis added). In other words, the ANDA at issue contained the HE Indication and the IBS-D Indication; the HE Indication infringed and the IBS-D Indication did not; and so the "entire ANDA" that included both indications was delayed. *Id.* But that did *not* mean that the judgment *also* delayed approval an ANDA that did *not* certify to the HE patents. The Federal Circuit

explained why that was the case:  A § 271(e)(4) order sets an approval date "not earlier than the date of the expiration of the patent which has been infringed" as to the "approval of the drug . . . *involved in the infringement*."  *Id.* at 1067-68 (quoting 35 U.S.C. § 271(e)(4)).  The court explained that since "FDA does not approve drugs in the abstract, but rather approves drugs for particular uses (indications) of that drug, the statute is appropriately construed as directed *to [delaying] approval of particular infringing uses of the drug, not all uses of the drug including non-infringing uses*."  *Id.* at 1068 (emphasis added).  Approval of the "drug" itself is not delayed.  *Id.*

The Federal Circuit explained that because the Patent Act governs infringing uses of a drug, the judgment could delay approval of "the specific ANDA in question *that included an infringing use*," *i.e.*, the HE Indication, as identified in the then-operative original '369 ANDA, label, and evidence pertaining to the HE Indication before the Delaware court.  *Id.* (emphasis added).  Specifically, § 271(e)(2)(A) makes it an "act of infringement to submit" an ANDA "for a drug . . . the use of which is claimed in a patent," *i.e.*, with a correlating patent certification to that patent.  *Id.* (quoting 35 U.S.C. § 271(e)(2)(A)).  So "[t]he statutory scheme makes clear that it is not the potential use of Norwich's rifaximin for HE that constitutes the relevant infringement here, nor is it the unpatented drug compound itself, but rather it is the submission of the ANDA that *included an infringing use*."  *Id.*  Again:

46

For purposes of this case, the absence of any HE patent certification in the amended ANDA means there is no "infringing use," and no delay to approval. *See id.*

Accordingly, because of the certification to the HE patents and infringement of them, the judgment "appropriately delayed the effective final approval date of *'this infringing ANDA' submission*" only. *Id.* (emphasis added) (citation omitted). That is, the "district court order concerned *only the specific ANDA in question that included an infringing use* [the HE Indication], referred to the ANDA by its number, and enjoined the approval of *that ANDA*." *Id.* (emphases added). A § 271(e)(4) order is thus limited to the "operative" application that serves as the "'act of infringement'" and describes "[w]hat is likely to be sold." *Ferring B.V. v. Watson Laboratories, Inc.-Florida*, 764 F.3d 1382, 1388, 1391 (Fed. Cir. 2014).

At the time of the Delaware court's judgment, Norwich had not yet "submit[ted] an application" for the amended ANDA *lacking* the HE Indication and HE patent certifications, so the amended ANDA could not become subject to a § 271(e)(4) order, which can only delay "approval of the drug . . . involved in the infringement" in the "application" "*submit[ed]*" to FDA. 35 U.S.C. § 271(e)(2), (e)(4) (emphasis added). When the Patent Act refers to the "'submi[ssion]'" of an "'application'" "'for a drug . . . the use of which is claimed in a patent,'" "the statute refers not to the initial filing but to the *filing as amended*." *Ferring*, 764 F.3d at 1390-91 (emphasis added) (quoting 35 U.S.C. § 271(e)(2)). The statute does not

support a § 271(e)(4) order directed to a hypothetical amended ANDA that has not yet been submitted to FDA, as FDA contends occurred in this case. *See id.*

The upshot of all of this is that the Delaware court's judgment did not even purport to delay approval of the (then-non-existent) amended ANDA.

### D. The Post-Judgment Rule 60 Order Reaffirms the Meaning of the Judgment

Despite the limited scope of the Delaware judgment, the district court found that post-judgment developments meant the judgment should be read to apply to the amended '369 ANDA. The Delaware court's decision not to consider the amended ANDA after the judgment reinforces Norwich's position in this case, rather than undercutting it.

The question before the Delaware court in deciding whether to modify the judgment post-amendment under Rule 60 differed subtly from the question when the court's order originally provided the rationale for the judgment pre-amendment. At the time of judgment, the court stated it was delaying approval of the infringing ANDA containing the HE Indication that was before the court, and refused to opine on a hypothetical ANDA omitting the HE Indication. *Supra* at 20-22. Anticipating (correctly) that Salix would later make mischief to further delay approval, Norwich sensibly sought express assurances from the court in a post-judgment posture that the amended ANDA now on file "would not be inducing infringement" of Salix's patents. JA__ (AR359). The Delaware court refused to consider the amended

48

ANDA, or adjudicate any infringement or resultant delay to approval of the amended ANDA in such a "summary fashion." *Id.*

The Delaware court refused to consider the amended ANDA in any way, just as it had refused to consider any *hypothetical* amended ANDA in the original judgment months earlier. The court explained: "Defendant filed an ANDA seeking to make and market a drug for *two different methods of treatment*—the IBS-D indication and the HE indication," and the court "ordered the FDA not to approve *the ANDA* before the latest expiration (in about 2029) of the *patents on which Plaintiffs won*," *i.e.*, the HE Indication. JA__-__ (AR358-59) (emphasis added). The amended ANDA lacking the HE Indication and the HE patent certifications was simply a "new issue after judgment" that would require essentially "a second litigation." JA__ (AR361). Thus, as the Federal Circuit explained, the Delaware court "held that consideration of the amended ANDA would be inequitable and inappropriate," since analyzing that ANDA would effective require a "'second litigation.'" *Salix*, 98 F.4th at 1069 (citation omitted). The Delaware court could hardly have ruled on an issue, *i.e.*, delaying the approval date of the amended ANDA, that it expressly refused to even consider after judgment. *See, e.g.*, *UC Health v. NLRB*, 803 F.3d 669, 682 (D.C. Cir. 2015) (Edwards, J., concurring) (explaining that "a judicial decision attaches a specific legal consequence to [the] detailed set of facts" before the court—not facts or arguments the court did not consider).

To the contrary, the Delaware court's Rule 60 order refusing to modify the judgment expressly contemplated the amended ANDA could be quickly approved under the court's prior judgment. Specifically, the court rejected the argument that its judgment would mean there is no "generic competition . . . on the IBS-D treatment method for *some period of time*." JA__-__ (AR360-61) (emphasis added). The court found that argument "speculative, since there is *no information* about if or *when* the FDA might approve the amended ANDA." JA__ (AR361) (emphasis added). The court thus did not understand its judgment to bar approval of the amended ANDA until 2029, if there was "no information" about the amended ANDA's approval date, or any reason to believe generic competition would be delayed for "some period of time."

The Delaware court's refusal to opine, one way or another, on the approval date of the amended ANDA, or its potential infringement, makes sense in this *post*-judgment context under the high bar of Rule 60. A court has some inherent discretion to consider an amendment to the operative ANDA *prior to* issuing a judgment, and potentially tailor its judgment to address (or not address) the issue of infringement of the amended ANDA. *See Ferring*, 764 F.3d at 1391. But *after* a "judgment finding that the *operative* ANDA infringes," the court "*must* . . . enter a § 271(e)(4) resetting order" on that "operative ANDA." *Id.* (emphasis added). At that point, the bar for an amended ANDA to be considered by the court, or potential

50

infringement adjudicated, in the *same proceeding* becomes much higher than merely the district court's discretion: Federal Rule of Civil Procedure 60's higher bar to modify a judgment includes that the judgment is impacted by "newly discovered evidence" or its application is "no longer equitable."

Here, the court found that Rule 60 was not satisfied, and therefore the Court would not consider or rule upon the amended ANDA. The court found that, because the amended ANDA was not part of the prior proceedings or judgment, and the court had no information about the amended ANDA besides its label, Rule 60 did not authorize what would effectively be a "second litigation" to rule on "'summary judgment premised on new allegations.'" JA__ (AR361) (citation omitted). In short, Norwich could not modify the "particular ANDA" subject to the prior "judgment" and "change the ANDA . . . and win in a *summary proceeding*." JA__ (AR362) (emphasis added).

The district court below nonetheless read the Rule 60 order to be intended to delay approval of the amended version '369 ANDA. JA__ (Dkt. 67 at 38). Specifically, the court seemed concerned that, absent that interpretation of the Rule 60 order, an ANDA applicant like Norwich could litigate infringement concerning one ANDA for years, lose the patent case, and then immediately amend its ANDA to improperly evade the judgment. JA__ (Dkt. 67 at 37).

Not so.  When an applicant amends an ANDA after a patent court's judgment, the applicant must update its patent certifications and statements to conform to the revised drug label.  *See* 21 C.F.R. § 314.94(a)(12)(viii)(A).  FDA itself ensures that the ANDA applicant truthfully provides patent certifications or statements— whether as part of the original ANDA or any amended ANDA.  *See Mylan Laboratories, Inc. v. Thompson*, 389 F.3d 1272, 1282 (D.C. Cir. 2004) (permitting FDA on its own to treat inaccurate Paragraph IV certification as a Paragraph II certification).[7]  So an applicant cannot simply falsify a patent statement while maintaining the previously adjudicated infringing use in its ANDA.  The upshot of these safeguards is that Salix retains its monopoly on the HE Indication and nothing in the proposed amendments to the judgment would have changed that.

Even if all of these safeguards were to fail and FDA were to erroneously approve an infringing use of a drug, the branded manufacturer can still bring the "second litigation" the Delaware court suggested was needed to adjudicate infringement as to that amended ANDA, and enjoin marketing of that drug.  *See* 35 U.S.C. § 271(a)-(b) (authorizing patent suit arising from actual or induced infringement); *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320,

---

[7]  FDA's decisionmaking as to whether to require a patent certification or statement is subject to judicial review under the APA.  *See 3M v. Barr Laboratories, Inc.*, 289 F.3d 775, 783 (Fed. Cir. 2002).

1326-27 (Fed. Cir. 2021) (upholding jury finding of induced infringement based on generic company's marketing of drug for an indication for which it submitted a section viii statement).

Tellingly, Salix declined to challenge with FDA the accuracy of Norwich's amended patent certifications and statements, which disclaimed any intent to seek approval of rifaximin for the HE Indication and any overlap with Salix's HE patents. That makes sense: Salix had already litigated its patent portfolio relevant to the original ANDA and lost on every patent except for certain patents relevant to the HE Indication. *Supra* at 20. The amended ANDA expressly omits the HE Indication and removes the HE patent certifications, FDA agrees that the ANDA does so, and Salix has no basis to assert a claim with respect to a drug excluding those certifications that would withstand scrutiny under Rule 11.

For all of these reasons, Norwich was permitted to amend its label to a "skinny label" "carv[ing] out" the infringing method of use and obtain approval for the non-infringing use after the patent court's judgment. *See Caraco*, 566 U.S. at 406.

## II.   FDA'S CONTRARY POSITION COUNTERMANDS THE STATUTE'S PURPOSE AND HISTORY

FDA's refusal to immediately approve the amended '369 ANDA is not just inconsistent with the FDCA, FDA's regulations, and the Delaware court's judgment, but also contravenes the Hatch-Waxman amendments' purpose and history.

"A central purpose of the Hatch-Waxman Act . . . is 'to enable competitors to bring cheaper, generic . . . drugs to market as quickly as possible.'" *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1344 (Fed. Cir. 2007) (alteration in original) (citation omitted); *accord In re Barr Laboratories, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) ("Congress sought to get generic drugs into the hands of patients at reasonable prices–fast.").

Congress's four statutory timing rules identify the earliest date an ANDA may be approved without any blocking patent obstacle (or 180-day exclusivity). As the Supreme Court has observed, "[t]he Hatch-Waxman Amendments authorize the FDA to approve the marketing of a generic drug for particular unpatented uses; and section viii provides the mechanism for a generic company to identify those uses, so that a product with a label matching them can quickly come to market." *Caraco*, 566 U.S. at 415. By permitting an amended ANDA to carve out an indication that has been held infringing, the statute and FDA's regulation allow for swift approval of the ANDA for a separate, non-infringing indication. *See id.*; 21 C.F.R. § 314.107(b)(1)(ii). It would make no sense for Congress to adopt these carefully calibrated timing rules to expedite generic entry and delay approval of only an *infringing* ANDA containing *infringing* certifications, on one hand, and then provide that a patent judgment shall block an amended ANDA lacking those certifications, on the other.

FDA and Salix's theory strays even further from Congress's purposes. On their view, while the amended '369 ANDA is delayed by the Delaware court's judgment, that same judgment would *not* prevent approval of a *new, identical* ANDA, akin to the '370 ANDA, with a different ANDA number, that is identical in every way to the amended ANDA (apart from one digit in its identifying number). Indeed, the Federal Circuit made clear that a § 271(e)(4) order cannot "prevent approval of a new non-infringing ANDA." *Salix*, 98 F.4th at 1068. FDA and Salix's interpretation, that an applicant must file a new ANDA (or amend a distinct, existing ANDA with a different number, as here), to contain identical content, simply to change one digit in the ANDA's number, makes no sense in this statutory scheme.

The burdens of filing a distinct ANDA containing a carve-out label are not insubstantial. Preparing an ANDA takes time and money, and in addition, the filing fee is approximately $321,920. 89 Fed. Reg. 61,446, 61,446 (July 31, 2024). (Here, Norwich amended its pending '370 ANDA to mirror the '369 ANDA, incurring substantial costs, *see supra* at 29.) FDA review and approval is supposed to take 180 days from receipt of a newly submitted ANDA, but in practice "often exceeds 180 days." 86 Fed. Reg. 4083, 4083 (Jan. 15, 2021). And FDA maintains that submitting a new ANDA resets the ANDA approval timeline.

Under FDA and Salix's position, rather than rewarding the ANDA applicant for incurring the costs of defending a patent infringement suit and successfully

55

prevailing in invalidating almost all of the patents at issue, *see* JA__-__ (AR41-42), the applicant is further delayed from marketing a non-infringing generic.  Rather than permit final approval of the amended, non-infringing ANDA, FDA and Salix would have the applicant file a *new* ANDA after patent litigation (or, as here, amend a distinct ANDA).  That ANDA would start the approval process over again from the back of the line, for an identical application containing the same carved-out "skinny label" as the amended ANDA that FDA refuses to finally approve.  FDA and Salix have no explanation why Congress would have intended any of that.

## CONCLUSION

For the foregoing reasons, the Court should reverse, with instructions to grant

Norwich summary judgment.

Dated: June 13, 2025                    Respectfully submitted,

                                        /s/ Andrew D. Prins

Matthew S. Murphy                       Andrew D. Prins
AXINN, VELTROP & HARKRIDER LLP          Peter E. Davis
90 State House Square                   LATHAM & WATKINS LLP
Hartford, CT 06103                      555 Eleventh Street, NW
(860) 275-8100                          Suite 1000
mmurphy@axinn.com                       Washington, DC 20004
                                        (202) 637-3317
                                        andrew.prins@lw.com
                                        peter.davis@lw.com

                                        Nicholas L. Schlossman
                                        LATHAM & WATKINS LLP
                                        300 Colorado Street
                                        Suite 2400
                                        Austin, TX 78701
                                        (737) 910-7314
                                        nicholas.schlossman@lw.com

                                        *Counsel for Plaintiff-Appellant*
                                        *Norwich Pharmaceuticals, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32(f) and (g), and D.C. Cir. Rule 32(e)(2), because it contains 12,976 words, including 144 words manually counted in any visual images.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word and Times New Roman 14-point font.

June 13, 2025                          */s/ Andrew J. Prins*
                                       Andrew J. Prins

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2025, I electronically filed the foregoing brief with the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Andrew J. Prins*
Andrew J. Prins

# ADDENDUM
## Pursuant to Rule 28(a)(5)

# TABLE OF CONTENTS

**Page**

21 U.S.C. § 355(j) ...............................................................................ADD-1

35 U.S.C. § 271 ...................................................................................ADD-24

21 C.F.R. § 314.94(a)..........................................................................ADD-29

## 21 U.S.C. § 355

**§ 355.  New drugs**

* * *

**(j) Abbreviated new drug applications**

(1)  Any person may file with the Secretary an abbreviated application for the approval of a new drug.

(2)(A)  An abbreviated application for a new drug shall contain—

(i) information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for a drug listed under paragraph (7) (hereinafter in this subsection referred to as a "listed drug");

(ii)(I) if the listed drug referred to in clause (i) has only one active ingredient, information to show that the active ingredient of the new drug is the same as that of the listed drug;

(II)  if the listed drug referred to in clause (i) has more than one active ingredient, information to show that the active ingredients of the new drug are the same as those of the listed drug, or

(III)  if the listed drug referred to in clause (i) has more than one active ingredient and if one of the active ingredients of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the other active ingredients of the new drug are the same as the active ingredients of the listed drug, information to show that the different active ingredient is an active ingredient of a listed drug or of a drug which does not meet the requirements of section 321(p) of this title, and such other information respecting the different active ingredient with respect to which the petition was filed as the Secretary may require;

(iii) information to show that the route of administration, the dosage form, and the strength of the new drug are the same as those of the listed drug referred to in clause (i) or, if the route of administration, the dosage form, or the strength of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), such information respecting the route of administration, dosage form, or strength with respect to which the petition was filed as the Secretary may require;

(iv)  information to show that the new drug is bioequivalent to the listed drug referred to in clause (i), except that if the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in clause (i) and the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in clause (i);

(v)  information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug referred to in clause (i) except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers;

(vi)  the items specified in clauses (ii) through (vi) of subsection (b)(1)(A);

(vii)  a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the listed drug referred to in clause (i) or which claims a use for such listed drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under subsection (b) or (c)—

(I)  that such patent information has not been filed,

(II)  that such patent has expired,

(III)  of the date on which such patent will expire, or

(IV)  that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and

(viii)  if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

The Secretary may not require that an abbreviated application contain information in addition to that required by clauses (i) through (viii).

(B) NOTICE OF OPINION THAT PATENT IS INVALID OR WILL NOT BE INFRINGED.—

(i) AGREEMENT TO GIVE NOTICE.—An applicant that makes a certification described in subparagraph (A)(vii)(IV) shall include in the application a statement that the applicant will give notice as required by this subparagraph.

(ii) TIMING OF NOTICE.—An applicant that makes a certification described in subparagraph (A)(vii)(IV) shall give notice as required under this subparagraph—

(I)  if the certification is in the application, not later than 20 days after the date of the postmark on the notice with which the Secretary informs the applicant that the application has been filed; or

(II) if the certification is in an amendment or supplement to the application, at the time at which the applicant submits the amendment or supplement, regardless of whether the applicant has already given notice with respect to another such certification contained in the application or in an amendment or supplement to the application.

(iii) RECIPIENTS OF NOTICE.—An applicant required under this subparagraph to give notice shall give notice to—

(I)  each owner of the patent that is the subject of the certification (or a representative of the owner designated to receive such a notice); and

(II)  the holder of the approved application under subsection (b) for the drug that is claimed by the patent or a use of which is claimed by the patent (or a representative of the holder designated to receive such a notice).

(iv) CONTENTS OF NOTICE.—A notice required under this subparagraph shall—

(I)  state that an application that contains data from bioavailability or bioequivalence studies has been submitted under this subsection for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of the drug before the expiration of the patent referred to in the certification; and

(II)  include a detailed statement of the factual and legal basis of the opinion of the applicant that the patent is invalid or will not be infringed.

(C)  If a person wants to submit an abbreviated application for a new drug which has a different active ingredient or whose route of administration, dosage form, or strength differ from that of a listed drug, such person shall submit a petition to the Secretary seeking permission to file such an application.  The Secretary shall approve or disapprove a petition submitted under this subparagraph within ninety days of the date the petition is submitted. The Secretary shall approve such a petition unless the Secretary finds—

(i)  that investigations must be conducted to show the safety and effectiveness of the drug or of any of its active ingredients, the route of administration, the dosage form, or strength which differ from the listed drug; or

(ii)  that any drug with a different active ingredient may not be adequately evaluated for approval as safe and effective on the basis of the information required to be submitted in an abbreviated application.

(D)(i)  An applicant may not amend or supplement an application to seek approval of a drug referring to a different listed drug from the listed drug identified in the application as submitted to the Secretary.

(ii)  With respect to the drug for which an application is submitted, nothing in this subsection prohibits an applicant from amending or supplementing the application to seek approval of a different strength.

(iii)  Within 60 days after December 8, 2003, the Secretary shall issue guidance defining the term "listed drug" for purposes of this subparagraph.

(3)(A)  The Secretary shall issue guidance for the individuals who review applications submitted under paragraph (1), which shall relate to promptness in conducting the review, technical excellence, lack of bias and conflict of interest, and knowledge of regulatory and scientific standards, and which shall apply equally to all individuals who review such applications.

(B)  The Secretary shall meet with a sponsor of an investigation or an applicant for approval for a drug under this subsection if the sponsor or applicant makes a reasonable written request for a meeting for the purpose of reaching agreement on the design and size of bioavailability and bioequivalence studies needed for approval of such application.  The sponsor or applicant shall provide information necessary for discussion and agreement on the design and size of such studies.  Minutes of any such meeting shall be prepared by the Secretary and made available to the sponsor or applicant.

(C) Any agreement regarding the parameters of design and size of bioavailability and bioequivalence studies of a drug under this paragraph that is reached between the Secretary and a sponsor or applicant shall be reduced to writing and made part of the administrative record by the Secretary. Such agreement shall not be changed after the testing begins, except—

  (i) with the written agreement of the sponsor or applicant; or

  (ii) pursuant to a decision, made in accordance with subparagraph (D) by the director of the reviewing division, that a substantial scientific issue essential to determining the safety or effectiveness of the drug has been identified after the testing has begun.

(D) A decision under subparagraph (C)(ii) by the director shall be in writing and the Secretary shall provide to the sponsor or applicant an opportunity for a meeting at which the director and the sponsor or applicant will be present and at which the director will document the scientific issue involved.

(E) The written decisions of the reviewing division shall be binding upon, and may not directly or indirectly be changed by, the field or compliance office personnel unless such field or compliance office personnel demonstrate to the reviewing division why such decision should be modified.

(F) No action by the reviewing division may be delayed because of the unavailability of information from or action by field personnel unless the reviewing division determines that a delay is necessary to assure the marketing of a safe and effective drug.

(G) For purposes of this paragraph, the reviewing division is the division responsible for the review of an application for approval of a drug under this subsection (including scientific matters, chemistry, manufacturing, and controls).

(4) Subject to paragraph (5), the Secretary shall approve an application for a drug unless the Secretary finds—

  (A) the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality, and purity;

  (B) information submitted with the application is insufficient to show that each of the proposed conditions of use have been previously approved for the listed drug referred to in the application;

(C)(i) if the listed drug has only one active ingredient, information submitted with the application is insufficient to show that the active ingredient is the same as that of the listed drug;

(ii) if the listed drug has more than one active ingredient, information submitted with the application is insufficient to show that the active ingredients are the same as the active ingredients of the listed drug, or

(iii) if the listed drug has more than one active ingredient and if the application is for a drug which has an active ingredient different from the listed drug, information submitted with the application is insufficient to show—

(I) that the other active ingredients are the same as the active ingredients of the listed drug, or

(II) that the different active ingredient is an active ingredient of a listed drug or a drug which does not meet the requirements of section 321(p) of this title,

or no petition to file an application for the drug with the different ingredient was approved under paragraph (2)(C);

(D)(i) if the application is for a drug whose route of administration, dosage form, or strength of the drug is the same as the route of administration, dosage form, or strength of the listed drug referred to in the application, information submitted in the application is insufficient to show that the route of administration, dosage form, or strength is the same as that of the listed drug, or

(ii) if the application is for a drug whose route of administration, dosage form, or strength of the drug is different from that of the listed drug referred to in the application, no petition to file an application for the drug with the different route of administration, dosage form, or strength was approved under paragraph (2)(C);

(E) if the application was filed pursuant to the approval of a petition under paragraph (2)(C), the application did not contain the information required by the Secretary respecting the active ingredient, route of administration, dosage form, or strength which is not the same;

(F) information submitted in the application is insufficient to show that the drug is bioequivalent to the listed drug referred to in the application or, if the application was filed pursuant to a petition approved under paragraph (2)(C), information submitted in the application is insufficient to show that

the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in paragraph (2)(A)(i) and that the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in such paragraph;

(G)  information submitted in the application is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug referred to in the application except for changes required because of differences approved under a petition filed under paragraph (2)(C) or because the drug and the listed drug are produced or distributed by different manufacturers;

(H)  information submitted in the application or any other information available to the Secretary shows that (i) the inactive ingredients of the drug are unsafe for use under the conditions prescribed, recommended, or suggested in the labeling proposed for the drug, or (ii) the composition of the drug is unsafe under such conditions because of the type or quantity of inactive ingredients included or the manner in which the inactive ingredients are included;

(I)  the approval under subsection (c) of the listed drug referred to in the application under this subsection has been withdrawn or suspended for grounds described in the first sentence of subsection (e), the Secretary has published a notice of opportunity for hearing to withdraw approval of the listed drug under subsection (c) for grounds described in the first sentence of subsection (e), the approval under this subsection of the listed drug referred to in the application under this subsection has been withdrawn or suspended under paragraph (6), or the Secretary has determined that the listed drug has been withdrawn from sale for safety or effectiveness reasons;

(J)  the application does not meet any other requirement of paragraph (2)(A); or

(K)  the application contains an untrue statement of material fact.

(5)(A) Within one hundred and eighty days of the initial receipt of an application under paragraph (2) or within such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall approve or disapprove the application.

(B)  The approval of an application submitted under paragraph (2) shall be made effective on the last applicable date determined by applying the following to each certification made under paragraph (2)(A)(vii):

(i)  If the applicant only made a certification described in subclause (I) or (II) of paragraph (2)(A)(vii) or in both such subclauses, the approval may be made effective immediately.

(ii)  If the applicant made a certification described in subclause (III) of paragraph (2)(A)(vii), the approval may be made effective on the date certified under subclause (III).

(iii)  If the applicant made a certification described in subclause (IV) of paragraph (2)(A)(vii), the approval shall be made effective immediately unless, before the expiration of 45 days after the date on which the notice described in paragraph (2)(B) is received, an action is brought for infringement of the patent that is the subject of the certification and for which information was submitted to the Secretary under subsection (b)(1) or (c)(2) before the date on which the application (excluding an amendment or supplement to the application), which the Secretary later determines to be substantially complete, was submitted.  If such an action is brought before the expiration of such days, the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that—

(I)  if before the expiration of such period the district court decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on—

(aa)  the date on which the court enters judgment reflecting the decision; or

(bb)  the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed;

(II)  if before the expiration of such period the district court decides that the patent has been infringed—

(aa)  if the judgment of the district court is appealed, the approval shall be made effective on—

(AA) the date on which the court of appeals decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity); or

(BB) the date of a settlement order or consent decree signed and entered by the court of appeals stating that the patent that is the subject of the certification is invalid or not infringed; or

(bb) if the judgment of the district court is not appealed or is affirmed, the approval shall be made effective on the date specified by the district court in a court order under section 271(e)(4)(A) of title 35;

(III) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent is invalid or not infringed, the approval shall be made effective as provided in subclause (I); or

(IV) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent has been infringed, the approval shall be made effective as provided in subclause (II).

In such an action, each of the parties shall reasonably cooperate in expediting the action.

(iv)  180-DAY EXCLUSIVITY PERIOD.—

(I)  EFFECTIVENESS OF APPLICATION.—Subject to subparagraph (D), if the application contains a certification described in paragraph (2)(A)(vii)(IV) and is for a drug for which a first applicant has submitted an application containing such a certification, the application shall be made effective on the date that is 180 days after the date of the first commercial marketing of the drug (including the commercial marketing of the listed drug) by any first applicant.

(II)  DEFINITIONS.—In this paragraph:

(aa) 180-DAY EXCLUSIVITY PERIOD.—The term "180-day exclusivity period" means the 180-day period ending on the day

before the date on which an application submitted by an applicant other than a first applicant could become effective under this clause.

(bb) FIRST APPLICANT.—As used in this subsection, the term "first applicant" means an applicant that, on the first day on which a substantially complete application containing a certification described in paragraph (2)(A)(vii)(IV) is submitted for approval of a drug, submits a substantially complete application that contains and lawfully maintains a certification described in paragraph (2)(A)(vii)(IV) for the drug.

(cc) SUBSTANTIALLY COMPLETE APPLICATION.—As used in this subsection, the term "substantially complete application" means an application under this subsection that on its face is sufficiently complete to permit a substantive review and contains all the information required by paragraph (2)(A).

(dd) TENTATIVE APPROVAL.—

(AA) IN GENERAL.—The term "tentative approval" means notification to an applicant by the Secretary that an application under this subsection meets the requirements of paragraph (2)(A), but cannot receive effective approval because the application does not meet the requirements of this subparagraph, there is a period of exclusivity for the listed drug under subparagraph (F) or section 355a of this title, or there is a 7-year period of exclusivity for the listed drug under section 360cc of this title.

(BB) LIMITATION.—A drug that is granted tentative approval by the Secretary is not an approved drug and shall not have an effective approval until the Secretary issues an approval after any necessary additional review of the application.

(v) 180-DAY EXCLUSIVITY PERIOD FOR COMPETITIVE GENERIC THERAPIES.—

(I) EFFECTIVENESS OF APPLICATION.—Subject to subparagraph (D)(iv), if the application is for a drug that is the same as a competitive generic therapy for which any first approved applicant has commenced commercial marketing, the application shall be made effective on the date that is 180 days after the date of the first commercial marketing of the competitive generic therapy (including the commercial marketing of the listed drug) by any first approved applicant.

(II) LIMITATION.—The exclusivity period under subclause (I) shall not apply with respect to a competitive generic therapy that has previously received an exclusivity period under subclause (I).

(III) DEFINITIONS.—In this clause and subparagraph (D)(iv):

(aa) The term "competitive generic therapy" means a drug—

(AA) that is designated as a competitive generic therapy under section 356h of this title; and

(BB) for which there are no unexpired patents or exclusivities on the list of products described in section 355(j)(7)(A) of this title at the time of submission.

(bb) The term "first approved applicant" means any applicant that has submitted an application that—

(AA) is for a competitive generic therapy that is approved on the first day on which any application for such competitive generic therapy is approved;

(BB) is not eligible for a 180-day exclusivity period under clause (iv) for the drug that is the subject of the application for the competitive generic therapy; and

(CC) is not for a drug for which all drug versions have forfeited eligibility for a 180-day exclusivity period under clause (iv) pursuant to subparagraph (D).

(C) CIVIL ACTION TO OBTAIN PATENT CERTAINTY.—

(i) DECLARATORY JUDGMENT ABSENT INFRINGEMENT ACTION.—

(I) IN GENERAL.—No action may be brought under section 2201 of title 28 by an applicant under paragraph (2) for a declaratory judgment with respect to a patent which is the subject of the certification referred to in subparagraph (B)(iii) unless—

(aa) the 45-day period referred to in such subparagraph has expired;

(bb) neither the owner of such patent nor the holder of the approved application under subsection (b) for the drug that is claimed by the patent or a use of which is claimed by the patent brought a civil action against the applicant for infringement of the patent before the expiration of such period; and

(cc) in any case in which the notice provided under paragraph (2)(B) relates to noninfringement, the notice was accompanied by a document described in subclause (III).

(II) FILING OF CIVIL ACTION.—If the conditions described in items (aa), (bb), and as applicable, (cc) of subclause (I) have been met, the applicant referred to in such subclause may, in accordance with section 2201 of title 28, bring a civil action under such section against the owner or holder referred to in such subclause (but not against any owner or holder that has brought such a civil action against the applicant, unless that civil action was dismissed without prejudice) for a declaratory judgment that the patent is invalid or will not be infringed by the drug for which the applicant seeks approval, except that such civil action may be brought for a declaratory judgment that the patent will not be infringed only in a case in which the condition described in subclause (I)(cc) is applicable. A civil action referred to in this subclause shall be brought in the judicial district where the defendant has its principal place of business or a regular and established place of business.

(III) OFFER OF CONFIDENTIAL ACCESS TO APPLICATION.—For purposes of subclause (I)(cc), the document described in this subclause is a document providing an offer of confidential access to the application that is in the custody of the applicant under paragraph (2) for the purpose of determining whether an action referred to in subparagraph (B)(iii) should be brought. The document providing the offer of confidential access shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information. A request for access to an application under an offer of confidential access shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract. Any person provided an offer of confidential access shall review the application for the sole and limited purpose of evaluating possible infringement of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV) and for no other purpose, and may not disclose information of no relevance to any issue of patent infringement to any person other than a person provided an offer of confidential access. Further, the application may be redacted

by the applicant to remove any information of no relevance to any issue of patent infringement.

(ii) COUNTERCLAIM TO INFRINGEMENT ACTION.—

(I) IN GENERAL.—If an owner of the patent or the holder of the approved application under subsection (b) for the drug that is claimed by the patent or a use of which is claimed by the patent brings a patent infringement action against the applicant, the applicant may assert a counterclaim seeking an order requiring the holder to correct or delete the patent information submitted by the holder under subsection (b) or (c) on the ground that the patent does not claim either—

(aa) the drug for which the application was approved; or

(bb) an approved method of using the drug.

(II) NO INDEPENDENT CAUSE OF ACTION.—Subclause (I) does not authorize the assertion of a claim described in subclause (I) in any civil action or proceeding other than a counterclaim described in subclause (I).

(iii) NO DAMAGES.—An applicant shall not be entitled to damages in a civil action under clause (i) or a counterclaim under clause (ii).

(D) FORFEITURE OF 180-DAY EXCLUSIVITY PERIOD.—

(i) DEFINITION OF FORFEITURE EVENT.—In this subparagraph, the term "forfeiture event", with respect to an application under this subsection, means the occurrence of any of the following:

(I) FAILURE TO MARKET.—The first applicant fails to market the drug by the later of—

(aa) the earlier of the date that is—

(AA) 75 days after the date on which the approval of the application of the first applicant is made effective under subparagraph (B)(iii); or

(BB) 30 months after the date of submission of the application of the first applicant; or

(bb) with respect to the first applicant or any other applicant (which other applicant has received tentative approval), the date that is 75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity

period under subparagraph (B)(iv), at least 1 of the following has occurred:

(AA) In an infringement action brought against that applicant with respect to the patent or in a declaratory judgment action brought by that applicant with respect to the patent, a court enters a final decision from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed.

(BB) In an infringement action or a declaratory judgment action described in subitem (AA), a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.

(CC) The patent information submitted under subsection (b) or (c) is withdrawn by the holder of the application approved under subsection (b).

(II) WITHDRAWAL OF APPLICATION.—The first applicant withdraws the application or the Secretary considers the application to have been withdrawn as a result of a determination by the Secretary that the application does not meet the requirements for approval under paragraph (4).

(III) AMENDMENT OF CERTIFICATION.—The first applicant amends or withdraws the certification for all of the patents with respect to which that applicant submitted a certification qualifying the applicant for the 180-day exclusivity period.

(IV) FAILURE TO OBTAIN TENTATIVE APPROVAL.—The first applicant fails to obtain tentative approval of the application within 30 months after the date on which the application is filed, unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed.

(V) AGREEMENT WITH ANOTHER APPLICANT, THE LISTED DRUG APPLICATION HOLDER, OR A PATENT OWNER.—The first applicant enters into an agreement with another applicant under this subsection for the drug, the holder of the application for the listed drug, or an owner of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV), the Federal Trade Commission or the Attorney General files a complaint, and there is a final decision of the Federal Trade Commission or the court with regard to the complaint from which no

ADD-14

appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the agreement has violated the antitrust laws (as defined in section 12 of title 15, except that the term includes section 45 of title 15 to the extent that that section applies to unfair methods of competition).

(VI) EXPIRATION OF ALL PATENTS.—All of the patents as to which the applicant submitted a certification qualifying it for the 180-day exclusivity period have expired.

(ii) FORFEITURE.—The 180-day exclusivity period described in subparagraph (B)(iv) shall be forfeited by a first applicant if a forfeiture event occurs with respect to that first applicant.

(iii) SUBSEQUENT APPLICANT.—If all first applicants forfeit the 180-day exclusivity period under clause (ii)—

(I) approval of any application containing a certification described in paragraph (2)(A)(vii)(IV) shall be made effective in accordance with subparagraph (B)(iii); and

(II) no applicant shall be eligible for a 180-day exclusivity period.

(iv) SPECIAL FORFEITURE RULE FOR COMPETITIVE GENERIC THERAPY.—The 180-day exclusivity period described in subparagraph (B)(v) shall be forfeited by a first approved applicant if the applicant fails to market the competitive generic therapy within 75 days after the date on which the approval of the first approved applicant's application for the competitive generic therapy is made effective.

(E) If the Secretary decides to disapprove an application, the Secretary shall give the applicant notice of an opportunity for a hearing before the Secretary on the question of whether such application is approvable. If the applicant elects to accept the opportunity for hearing by written request within thirty days after such notice, such hearing shall commence not more than ninety days after the expiration of such thirty days unless the Secretary and the applicant otherwise agree. Any such hearing shall thereafter be conducted on an expedited basis and the Secretary's order thereon shall be issued within ninety days after the date fixed by the Secretary for filing final briefs.

(F)(i) Repealed. Pub. L. 117–9, §1(b)(1)(B), Apr. 23, 2021, 135 Stat. 258.

(ii) If an application submitted under subsection (b) for a drug, no active moiety (as defined by the Secretary in section 314.3 of title 21, Code of Federal Regulations (or any successor regulations)) of which has been

approved in any other application under subsection (b), is approved after September 24, 1984, no application may be submitted under this subsection which refers to the drug for which the subsection (b) application was submitted before the expiration of five years from the date of the approval of the application under subsection (b), except that such an application may be submitted under this subsection after the expiration of four years from the date of the approval of the subsection (b) application if it contains a certification of patent invalidity or noninfringement described in subclause (IV) of paragraph (2)(A)(vii). The approval of such an application shall be made effective in accordance with subparagraph (B) except that, if an action for patent infringement is commenced during the one-year period beginning forty-eight months after the date of the approval of the subsection (b) application, the thirty-month period referred to in subparagraph (B)(iii) shall be extended by such amount of time (if any) which is required for seven and one-half years to have elapsed from the date of approval of the subsection (b) application.

(iii) If an application submitted under subsection (b) for a drug, which includes an active moiety (as defined by the Secretary in section 314.3 of title 21, Code of Federal Regulations (or any successor regulations)) that has been approved in another application approved under subsection (b), is approved after September 24, 1984, and if such application contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the applicant, the Secretary may not make the approval of an application submitted under this subsection for the conditions of approval of such drug in the subsection (b) application effective before the expiration of three years from the date of the approval of the application under subsection (b) for such drug.

(iv) If a supplement to an application approved under subsection (b) is approved after September 24, 1984, and the supplement contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the supplement and conducted or sponsored by the person submitting the supplement, the Secretary may not make the approval of an application submitted under this subsection for a change approved in the supplement effective before the expiration of three years from the date of the approval of the supplement under subsection (b).

(v) If an application (or supplement to an application) submitted under subsection (b) for a drug, which includes an active moiety (as defined by the Secretary in section 314.3 of title 21, Code of Federal Regulations (or any

successor regulations)) that has been approved in another application under subsection (b), was approved during the period beginning January 1, 1982, and ending on September 24, 1984, the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted or which refers to a change approved in a supplement to the subsection (b) application effective before the expiration of two years from September 24, 1984.

(6) If a drug approved under this subsection refers in its approved application to a drug the approval of which was withdrawn or suspended for grounds described in the first sentence of subsection (e) or was withdrawn or suspended under this paragraph or which, as determined by the Secretary, has been withdrawn from sale for safety or effectiveness reasons, the approval of the drug under this subsection shall be withdrawn or suspended—

(A) for the same period as the withdrawal or suspension under subsection (e) or this paragraph, or

(B) if the listed drug has been withdrawn from sale, for the period of withdrawal from sale or, if earlier, the period ending on the date the Secretary determines that the withdrawal from sale is not for safety or effectiveness reasons.

(7)(A)(i) Within sixty days of September 24, 1984, the Secretary shall publish and make available to the public—

(I) a list in alphabetical order of the official and proprietary name of each drug which has been approved for safety and effectiveness under subsection (c) before September 24, 1984;

(II) the date of approval if the drug is approved after 1981 and the number of the application which was approved; and

(III) whether in vitro or in vivo bioequivalence studies, or both such studies, are required for applications filed under this subsection which will refer to the drug published.

(ii) Every thirty days after the publication of the first list under clause (i) the Secretary shall revise the list to include each drug which has been approved for safety and effectiveness under subsection (c) or approved under this subsection during the thirty-day period.

(iii) When patent information submitted under subsection (c) respecting a drug included on the list is to be published by the Secretary, the Secretary

shall, in revisions made under clause (ii), include such information for such drug.

(iv) For each drug included on the list, the Secretary shall specify any exclusivity period that is applicable, for which the Secretary has determined the expiration date, and for which such period has not yet expired, under—

(I) clause (ii), (iii), or (iv) of subsection (c)(3)(E);

(II) clause (iv) or (v) of paragraph (5)(B);

(III) clause (ii), (iii), or (iv) of paragraph (5)(F);

(IV) section 355a of this title;

(V) section 355f of this title;

(VI) section 360cc(a) of this title; or

(VII) subsection (u).

(v)(I) With respect to an application submitted pursuant to subsection (b)(2) for a drug that is subject to section 353(b) of this title for which the sole difference from a listed drug relied upon in the application is a difference in inactive ingredients not permitted under clause (iii) or (iv) of section 314.94(a)(9) of title 21, Code of Federal Regulations (or any successor regulations), the Secretary shall make an evaluation with respect to whether such drug is a therapeutic equivalent (as defined in section 314.3 of title 21, Code of Federal Regulations (or any successor regulations)) to another approved drug product in the prescription drug product section of the list under this paragraph as follows:

(aa) With respect to such an application submitted after December 29, 2022, the evaluation shall be made with respect to a listed drug relied upon in the application pursuant to subsection (b)(2) that is a pharmaceutical equivalent (as defined in section 314.3 of title 21, Code of Federal Regulations (or any successor regulations)) to the drug in the application pursuant to subsection (b)(2) at the time of approval of such application or not later than 180 days after the date of such approval, provided that the request for such an evaluation is made in the original application (or in a resubmission to a complete response letter), and all necessary data and information are submitted in the original application (or in a resubmission in response to a complete response letter) for the therapeutic equivalence evaluation, including information to demonstrate bioequivalence, in a form and manner prescribed by the Secretary.

ADD-18

(bb) With respect to such an application approved prior to or on December 29, 2022, the evaluation shall be made not later than 180 days after receipt of a request for a therapeutic equivalence evaluation submitted as part of a supplement to such application; or with respect to an application that was submitted prior to December 29, 2022, but not approved as of December 29, 2022, the evaluation shall be made not later than 180 days after the date of approval of such application if a request for such evaluation is submitted as an amendment to the application, provided that—

(AA) such request for a therapeutic equivalence evaluation is being sought with respect to a listed drug relied upon in the application, and the relied upon listed drug is in the prescription drug product section of the list under this paragraph and is a pharmaceutical equivalent (as defined in section 314.3 of title 21, Code of Federal Regulations (or any successor regulations)) to the drug for which a therapeutic equivalence evaluation is sought; and

(BB) the amendment or supplement, as applicable, containing such request, or the relevant application, includes all necessary data and information for the therapeutic equivalence evaluation, including information to demonstrate bioequivalence, in a form and manner prescribed by the Secretary.

(II) When the Secretary makes an evaluation under subclause (I), the Secretary shall, in revisions made to the list pursuant to clause (ii), include such information for such drug.

(B) A drug approved for safety and effectiveness under subsection (c) or approved under this subsection shall, for purposes of this subsection, be considered to have been published under subparagraph (A) on the date of its approval or September 24, 1984, whichever is later.

(C) If the approval of a drug was withdrawn or suspended for grounds described in the first sentence of subsection (e) or was withdrawn or suspended under paragraph (6) or if the Secretary determines that a drug has been withdrawn from sale for safety or effectiveness reasons, it may not be published in the list under subparagraph (A) or, if the withdrawal or suspension occurred after its publication in such list, it shall be immediately removed from such list—

(i) for the same period as the withdrawal or suspension under subsection (e) or paragraph (6), or

ADD-19

(ii) if the listed drug has been withdrawn from sale, for the period of withdrawal from sale or, if earlier, the period ending on the date the Secretary determines that the withdrawal from sale is not for safety or effectiveness reasons.

A notice of the removal shall be published in the Federal Register.

(D)  In the case of a listed drug for which the list under subparagraph (A)(i) includes a patent for such drug, and any claim of the patent has been cancelled or invalidated pursuant to a final decision issued by the Patent Trial and Appeal Board of the United States Patent and Trademark Office or by a court, from which no appeal has been, or can be, taken, if the holder of the applicable application approved under subsection (c) determines that a patent for such drug, or any patent information for such drug, no longer meets the listing requirements under this section—

(i)  the holder of such approved application shall notify the Secretary, in writing, within 14 days of such decision of such cancellation or invalidation and request that such patent or patent information, as applicable, be amended or withdrawn in accordance with the decision issued by the Patent Trial and Appeal Board or a court;

(ii)  the holder of such approved application shall include in any notification under clause (i) information related to such patent cancellation or invalidation decision and submit such information, including a copy of such decision, to the Secretary; and

(iii)  the Secretary shall, in response to a notification under clause (i), amend or remove patent or patent information in accordance with the relevant decision from the Patent Trial and Appeals Board or court, as applicable, except that the Secretary shall not remove from the list any patent or patent information before the expiration of any 180-day exclusivity period under paragraph (5)(B)(iv) that relies on a certification described in paragraph (2)(A)(vii)(IV).

(8)  For purposes of this subsection:

(A)(i)  The term "bioavailability" means the rate and extent to which the active ingredient or therapeutic ingredient is absorbed from a drug and becomes available at the site of drug action.

(ii)  For a drug that is not intended to be absorbed into the bloodstream, the Secretary may assess bioavailability by scientifically valid measurements intended to reflect the rate and extent to which the active

ingredient or therapeutic ingredient becomes available at the site of drug action.

(B)  A drug shall be considered to be bioequivalent to a listed drug if—

(i) the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses; or

(ii) the extent of absorption of the drug does not show a significant difference from the extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses and the difference from the listed drug in the rate of absorption of the drug is intentional, is reflected in its proposed labeling, is not essential to the attainment of effective body drug concentrations on chronic use, and is considered medically insignificant for the drug.

(C)  For a drug that is not intended to be absorbed into the bloodstream, the Secretary may establish alternative, scientifically valid methods to show bioequivalence if the alternative methods are expected to detect a significant difference between the drug and the listed drug in safety and therapeutic effect.

(9)  The Secretary shall, with respect to each application submitted under this subsection, maintain a record of—

(A)  the name of the applicant,

(B)  the name of the drug covered by the application,

(C)  the name of each person to whom the review of the chemistry of the application was assigned and the date of such assignment, and

(D)  the name of each person to whom the bioequivalence review for such application was assigned and the date of such assignment.

The information the Secretary is required to maintain under this paragraph with respect to an application submitted under this subsection shall be made available to the public after the approval of such application.

(10)(A) If the proposed labeling of a drug that is the subject of an application under this subsection differs from the listed drug due to a labeling revision described under clause (i), the drug that is the subject of

such application shall, notwithstanding any other provision of this chapter, be eligible for approval and shall not be considered misbranded under section 352 of this title if—

(i)  a revision to the labeling of the listed drug has been approved by the Secretary within 90 days of when the application is otherwise eligible for approval under this subsection;

(ii)  the sponsor of the application agrees to submit revised labeling for the drug that is the subject of the application not later than 60 days after approval under this subsection of the application;

(iii)  the labeling revision described under clause (i) does not include a change to the "Warnings" section of the labeling; and

(iv)  such application otherwise meets the applicable requirements for approval under this subsection.

(B) If, after a labeling revision described in subparagraph (A)(i), the Secretary determines that the continued presence in interstate commerce of the labeling of the listed drug (as in effect before the revision described in subparagraph (A)(i)) adversely impacts the safe use of the drug, no application under this subsection shall be eligible for approval with such labeling.

(11)(A)  Subject to subparagraph (B), the Secretary shall prioritize the review of, and act within 8 months of the date of the submission of, an original abbreviated new drug application submitted for review under this subsection that is for a drug—

(i)  for which there are not more than 3 approved drug products listed under paragraph (7) and for which there are no blocking patents and exclusivities; or

(ii)  that has been included on the list under section 356e of this title.

(B)  To qualify for priority review under this paragraph, not later than 60 days prior to the submission of an application described in subparagraph (A) or that the Secretary may prioritize pursuant to subparagraph (D), the applicant shall provide complete, accurate information regarding facilities involved in manufacturing processes and testing of the drug that is the subject of the application, including facilities in corresponding Type II active pharmaceutical ingredients drug master files referenced in an application and sites or organizations involved in bioequivalence and clinical studies used to support the application, to enable the Secretary to

make a determination regarding whether an inspection of a facility is necessary. Such information shall include the relevant (as determined by the Secretary) sections of such application, which shall be unchanged relative to the date of the submission of such application, except to the extent that a change is made to such information to exclude a facility that was not used to generate data to meet any application requirements for such submission and that is not the only facility intended to conduct one or more unit operations in commercial production. Information provided by an applicant under this subparagraph shall not be considered the submission of an application under this subsection.

(C) The Secretary may expedite an inspection or reinspection under section 374 of this title of an establishment that proposes to manufacture a drug described in subparagraph (A).

(D) Nothing in this paragraph shall prevent the Secretary from prioritizing the review of other applications as the Secretary determines appropriate.

(12) The Secretary shall publish on the internet website of the Food and Drug Administration, and update at least once every 6 months, a list of all drugs approved under subsection (c) for which all patents and periods of exclusivity under this chapter have expired and for which no application has been approved under this subsection.

(13) Upon the request of an applicant regarding one or more specified pending applications under this subsection, the Secretary shall, as appropriate, provide review status updates indicating the categorical status of the applications by each relevant review discipline.

\* \* \*

## 35 U.S.C. § 271

### § 271.  Infringement of patent

(a)  Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

(b)  Whoever actively induces infringement of a patent shall be liable as an infringer.

(c)  Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

(d)  No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement; (4) refused to license or use any rights to the patent; or (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.

(e)(1)  It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention (other than a new animal drug or veterinary biological product (as those terms are used in the Federal Food, Drug, and Cosmetic Act and the Act of March 4, 1913) which is primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques) solely for uses reasonably related to the development and submission of information under a Federal law which

regulates the manufacture, use, or sale of drugs or veterinary biological products.

(2) It shall be an act of infringement to submit—

(A) an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent,

(B) an application under section 512 of such Act or under the Act of March 4, 1913 (21 U.S.C. 151–158) for a drug or veterinary biological product which is not primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques and which is claimed in a patent or the use of which is claimed in a patent, or

(C)(i) with respect to a patent that is identified in the list of patents described in section 351(*l*)(3) of the Public Health Service Act (including as provided under section 351(*l*)(7) of such Act), an application seeking approval of a biological product, or

(ii) if the applicant for the application fails to provide the application and information required under section 351(*l*)(2)(A) of such Act, an application seeking approval of a biological product for a patent that could be identified pursuant to section 351(*l*)(3)(A)(i) of such Act,

if the purpose of such submission is to obtain approval under such Act to engage in the commercial manufacture, use, or sale of a drug, veterinary biological product, or biological product claimed in a patent or the use of which is claimed in a patent before the expiration of such patent.

(3) In any action for patent infringement brought under this section, no injunctive or other relief may be granted which would prohibit the making, using, offering to sell, or selling within the United States or importing into the United States of a patented invention under paragraph (1).

(4) For an act of infringement described in paragraph (2)—

(A) the court shall order the effective date of any approval of the drug or veterinary biological product involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed,

(B) injunctive relief may be granted against an infringer to prevent the commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug, veterinary biological product, or biological product,

(C) damages or other monetary relief may be awarded against an infringer only if there has been commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug, veterinary biological product, or biological product, and

(D) the court shall order a permanent injunction prohibiting any infringement of the patent by the biological product involved in the infringement until a date which is not earlier than the date of the expiration of the patent that has been infringed under paragraph (2)(C), provided the patent is the subject of a final court decision, as defined in section 351(k)(6) of the Public Health Service Act, in an action for infringement of the patent under section 351(*l*)(6) of such Act, and the biological product has not yet been approved because of section 351(k)(7) of such Act.

The remedies prescribed by subparagraphs (A), (B), (C), and (D) are the only remedies which may be granted by a court for an act of infringement described in paragraph (2), except that a court may award attorney fees under section 285.

(5) Where a person has filed an application described in paragraph (2) that includes a certification under subsection (b)(2)(A)(iv) or (j)(2)(A)(vii)(IV) of section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355), and neither the owner of the patent that is the subject of the certification nor the holder of the approved application under subsection (b) of such section for the drug that is claimed by the patent or a use of which is claimed by the patent brought an action for infringement of such patent before the expiration of 45 days after the date on which the notice given under subsection (b)(3) or (j)(2)(B) of such section was received, the courts of the United States shall, to the extent consistent with the Constitution, have subject matter jurisdiction in any action brought by such person under section 2201 of title 28 for a declaratory judgment that such patent is invalid or not infringed.

(6)(A) Subparagraph (B) applies, in lieu of paragraph (4), in the case of a patent—

(i) that is identified, as applicable, in the list of patents described in section 351(*l*)(4) of the Public Health Service Act or the lists of patents described in section 351(*l*)(5)(B) of such Act with respect to a biological product; and

(ii) for which an action for infringement of the patent with respect to the biological product—

(I)  was brought after the expiration of the 30-day period described in subparagraph (A) or (B), as applicable, of section 351(l)(6) of such Act; or

(II)  was brought before the expiration of the 30-day period described in subclause (I), but which was dismissed without prejudice or was not prosecuted to judgment in good faith.

(B)  In an action for infringement of a patent described in subparagraph (A), the sole and exclusive remedy that may be granted by a court, upon a finding that the making, using, offering to sell, selling, or importation into the United States of the biological product that is the subject of the action infringed the patent, shall be a reasonable royalty.

(C)  The owner of a patent that should have been included in the list described in section 351(*l*)(3)(A) of the Public Health Service Act, including as provided under section 351(*l*)(7) of such Act for a biological product, but was not timely included in such list, may not bring an action under this section for infringement of the patent with respect to the biological product.

(f)(1)  Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

(2)  Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

(g)  Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent.  In an action for infringement of a process patent, no remedy may be granted for infringement on account of the noncommercial

use or retail sale of a product unless there is no adequate remedy under this title for infringement on account of the importation or other use, offer to sell, or sale of that product. A product which is made by a patented process will, for purposes of this title, not be considered to be so made after—

    (1)  it is materially changed by subsequent processes; or

    (2)  it becomes a trivial and nonessential component of another product.

  (h)  As used in this section, the term "whoever" includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his official capacity.  Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity.

  (i)  As used in this section, an "offer for sale" or an "offer to sell" by a person other than the patentee, or any designee of the patentee, is that in which the sale will occur before the expiration of the term of the patent.

## 21 C.F.R. § 314.94

### § 314.94.  Content and format of an ANDA.

ANDAs are required to be submitted in the form and contain the information required under this section.  Three copies of the ANDA are required, an archival copy, a review copy, and a field copy.  FDA will maintain guidance documents on the format and content of ANDAs to assist applicants in their preparation.

(a) *ANDAs*.  Except as provided in paragraph (b) of this section, the applicant must submit a complete archival copy of the abbreviated new drug application that includes the following:

(1) *Application form*.  The applicant must submit a completed and signed application form that contains the information described under § 314.50(a)(1), (a)(3), (a)(4), and (a)(5).  The applicant must state whether the submission is an ANDA under this section or a supplement to an ANDA under § 314.97.

(2) *Table of contents*.  The archival copy of the ANDA is required to contain a table of contents that shows the volume number and page number of the contents of the submission.

(3) *Basis for ANDA submission*.  An ANDA must refer to a listed drug.  Ordinarily, that listed drug will be the drug product selected by the Agency as the reference standard for conducting bioequivalence testing.  The ANDA must contain:

(i)  The name of the reference listed drug, including its dosage form and strength.  For an ANDA based on an approved petition under § 10.30 of this chapter and § 314.93, the reference listed drug must be the same as the listed drug referenced in the approved petition.

(ii)  A statement as to whether, according to the information published in the list, the reference listed drug is entitled to a period of marketing exclusivity under section 505(j)(5)(F) of the Federal Food, Drug, and Cosmetic Act.

(iii)  For an ANDA based on an approved petition under § 10.30 of this chapter and § 314.93, a reference to the FDA-assigned docket number for the petition and a copy of FDA's correspondence approving the petition.

(4) *Conditions of use.*  (i) A statement that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the drug product have been previously approved for the reference listed drug.

(ii)  A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

(5) *Active ingredients*. (i) For a single-active-ingredient drug product, information to show that the active ingredient is the same as that of the reference single-active-ingredient listed drug, as follows:

(A) A statement that the active ingredient of the proposed drug product is the same as that of the reference listed drug.

(B) A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

(ii) For a combination drug product, information to show that the active ingredients are the same as those of the reference listed drug except for any different active ingredient that has been the subject of an approved petition, as follows:

(A) A statement that the active ingredients of the proposed drug product are the same as those of the reference listed drug, or if one of the active ingredients differs from one of the active ingredients of the reference listed drug and the ANDA is submitted under the approval of a petition under § 314.93 to vary such active ingredient, information to show that the other active ingredients of the drug product are the same as the other active ingredients of the reference listed drug, information to show that the different active ingredient is an active ingredient of another listed drug or of a drug that does not meet the definition of "new drug" in section 201(p) of the Federal Food, Drug, and Cosmetic Act, and such other information about the different active ingredient that FDA may require.

(B) A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

(6) *Route of administration, dosage form, and strength*. (i) Information to show that the route of administration, dosage form, and strength of the drug product are the same as those of the reference listed drug except for any differences that have been the subject of an approved petition, as follows:

(A) A statement that the route of administration, dosage form, and strength of the proposed drug product are the same as those of the reference listed drug.

(B) A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

(ii) If the route of administration, dosage form, or strength of the drug product differs from the reference listed drug and the ANDA is submitted under an approved petition under § 314.93, such information about the different route of administration, dosage form, or strength that FDA may require.

ADD-30

(7) *Bioequivalence.*    (i) Information that shows that the drug product is bioequivalent to the reference listed drug upon which the applicant relies. A complete study report must be submitted for the bioequivalence study upon which the applicant relies for approval.  For all other bioequivalence studies conducted on the same drug product formulation as defined in § 314.3(b), the applicant must submit either a complete or summary report.  If a summary report of a bioequivalence study is submitted and FDA determines that there may be bioequivalence issues or concerns with the product, FDA may require that the applicant submit a complete report of the bioequivalence study to FDA; or

(ii) If the ANDA is submitted pursuant to a petition approved under § 314.93, the results of any bioavailability or bioequivalence testing required by the Agency, or any other information required by the Agency to show that the active ingredients of the proposed drug product are of the same pharmacological or therapeutic class as those in the reference listed drug and that the proposed drug product can be expected to have the same therapeutic effect as the reference listed drug.  If the proposed drug product contains a different active ingredient than the reference listed drug, FDA will consider the proposed drug product to have the same therapeutic effect as the reference listed drug if the applicant provides information demonstrating that:

(A)  There is an adequate scientific basis for determining that substitution of the specific proposed dose of the different active ingredient for the dose of the member of the same pharmacological or therapeutic class in the reference listed drug will yield a resulting drug product whose safety and effectiveness have not been adversely affected.

(B)  The unchanged active ingredients in the proposed drug product are bioequivalent to those in the reference listed drug.

(C)  The different active ingredient in the proposed drug product is bioequivalent to an approved dosage form containing that ingredient and approved for the same indication as the proposed drug product or is bioequivalent to a drug product offered for that indication which does not meet the definition of "new drug" under section 201(p) of the Federal Food, Drug, and Cosmetic Act.

(iii)  For each in vivo or in vitro bioequivalence study contained in the ANDA:

(A)  A description of the analytical and statistical methods used in each study; and

(B)  With respect to each study involving human subjects, a statement that the study either was conducted in compliance with the institutional review board regulations in part 56 of this chapter, or was not subject to the regulations under § 56.104 or § 56.105 of this chapter, and that it was conducted in compliance with the informed consent regulations in part 50 of this chapter.

(8) *Labeling*—(i) *Listed drug labeling*.  A copy of the currently approved labeling (including, if applicable, any Medication Guide required under part 208 of this chapter) for the listed drug referred to in the ANDA, if the ANDA relies on a reference listed drug.

(ii) *Copies of proposed labeling*.  Copies of the label and all labeling for the drug product including, if applicable, any Medication Guide required under part 208 of this chapter (4 copies of draft labeling or 12 copies of final printed labeling).

(iii) *Statement on proposed labeling*.  A statement that the applicant's proposed labeling including, if applicable, any Medication Guide required under part 208 of this chapter is the same as the labeling of the reference listed drug except for differences annotated and explained under paragraph (a)(8)(iv) of this section.

(iv) *Comparison of approved and proposed labeling*.  A side-by-side comparison of the applicant's proposed labeling including, if applicable, any Medication Guide required under part 208 of this chapter with the approved labeling for the reference listed drug with all differences annotated and explained.  Labeling (including the container label, package insert, and, if applicable, Medication Guide) proposed for the drug product must be the same as the labeling approved for the reference listed drug, except for changes required because of differences approved under a petition filed under § 314.93 or because the drug product and the reference listed drug are produced or distributed by different manufacturers.  Such differences between the applicant's proposed labeling and labeling approved for the reference listed drug may include differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity under section 505(j)(5)(F) of the Federal Food, Drug, and Cosmetic Act.

(9) *Chemistry, manufacturing, and controls*.  (i) The information required under § 314.50(d)(1), except that the information required under § 314.50(d)(1)(ii)(*c*) must contain the proposed or actual master production record, including a description of the equipment, to be used for the manufacture of a commercial lot of the drug product.

(ii) *Inactive ingredients*.  Unless otherwise stated in paragraphs (a)(9)(iii) through (a)(9)(v) of this section, an applicant must identify and characterize the inactive ingredients in the proposed drug product and provide information demonstrating that such inactive ingredients do not affect the safety or efficacy of the proposed drug product.

(iii) *Inactive ingredient changes permitted in drug products intended for parenteral use*.  Generally, a drug product intended for parenteral use must contain

the same inactive ingredients and in the same concentration as the reference listed drug identified by the applicant under paragraph (a)(3) of this section. However, an applicant may seek approval of a drug product that differs from the reference listed drug in preservative, buffer, or antioxidant provided that the applicant identifies and characterizes the differences and provides information demonstrating that the differences do not affect the safety or efficacy of the proposed drug product.

(iv) *Inactive ingredient changes permitted in drug products intended for ophthalmic or otic use*. Generally, a drug product intended for ophthalmic or otic use must contain the same inactive ingredients and in the same concentration as the reference listed drug identified by the applicant under paragraph (a)(3) of this section. However, an applicant may seek approval of a drug product that differs from the reference listed drug in preservative, buffer, substance to adjust tonicity, or thickening agent provided that the applicant identifies and characterizes the differences and provides information demonstrating that the differences do not affect the safety or efficacy of the proposed drug product, except that, in a product intended for ophthalmic use, an applicant may not change a buffer or substance to adjust tonicity for the purpose of claiming a therapeutic advantage over or difference from the listed drug, e.g., by using a balanced salt solution as a diluent as opposed to an isotonic saline solution, or by making a significant change in the pH or other change that may raise questions of irritability.

(v) *Inactive ingredient changes permitted in drug products intended for topical use*. Generally, a drug product intended for topical use, solutions for aerosolization or nebulization, and nasal solutions shall contain the same inactive ingredients as the reference listed drug identified by the applicant under paragraph (a)(3) of this section. However, an ANDA may include different inactive ingredients provided that the applicant identifies and characterizes the differences and provides information demonstrating that the differences do not affect the safety or efficacy of the proposed drug product.

(10) *Samples*. The information required under § 314.50(e)(1) and (e)(2)(i). Samples need not be submitted until requested by FDA.

(11) *Other*. The information required under § 314.50(g).

(12) *Patent certification*—(i) *Patents claiming drug substance, drug product, or method of use*. (A) An appropriate patent certification or statement with respect to each patent issued by the U.S. Patent and Trademark Office that, in the opinion of the applicant and to the best of its knowledge, claims the reference listed drug or that claims a use of such listed drug for which the applicant is seeking approval under section 505(j) of the Federal Food, Drug, and Cosmetic Act and for which information is required to be filed under section 505(b) and (c) of the Federal Food, Drug, and Cosmetic Act and § 314.53. For each such patent, the applicant must

provide the patent number and certify, in its opinion and to the best of its knowledge, one of the following circumstances:

(*1*)  That the patent information has not been submitted to FDA.  The applicant must entitle such a certification "Paragraph I Certification";

(*2*)  That the patent has expired. The applicant must entitle such a certification "Paragraph II Certification";

(*3*)  The date on which the patent will expire.  The applicant must entitle such a certification "Paragraph III Certification"; or

(*4*)(*i*)  That the patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the drug product for which the ANDA is submitted.  The applicant must entitle such a certification "Paragraph IV Certification".  This certification must be submitted in the following form:

I, ( *name of applicant*), certify that Patent No. _____ (*is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of*) (*name of proposed drug product*) for which this ANDA is submitted.

(*ii*)  The certification must be accompanied by a statement that the applicant will comply with the requirements under § 314.95(a) with respect to providing a notice to each owner of the patent or its representative and to the NDA holder (or, if the NDA holder does not reside or maintain a place of business within the United States, its attorney, agent, or other authorized official) for the listed drug, with the requirements under § 314.95(b) with respect to sending the notice, and with the requirements under § 314.95(c) with respect to the content of the notice.

(B)  If the ANDA refers to a listed drug that is itself a licensed generic product of a patented drug first approved under section 505(b) of the Federal Food, Drug, and Cosmetic Act, an appropriate patent certification or statement under paragraph (a)(12)(i) and/or (iii) of this section with respect to each patent that claims the first-approved patented drug or that claims a use for such drug.

(ii)  *No relevant patents*.  If, in the opinion of the applicant and to the best of its knowledge, there are no patents described in paragraph (a)(12)(i) of this section, a certification in the following form:

In the opinion and to the best knowledge of (name of applicant), there are no patents that claim the listed drug referred to in this ANDA or that claim a use of the listed drug.

(iii)  *Method-of-use patent*.  (A) If patent information is submitted under section 505(b) or (c) of the Federal Food, Drug, and Cosmetic Act and § 314.53 for a patent claiming a method of using the listed drug, and the labeling for the drug product for which the applicant is seeking approval does not include an indication or other

condition of use that is covered by the method-of-use patent, a statement explaining that the method-of-use patent does not claim a proposed indication or other condition of use.

(B)  If the labeling of the drug product for which the applicant is seeking approval includes an indication or other condition of use that, according to the patent information submitted under section 505(b) or (c) of the Federal Food, Drug, and Cosmetic Act and § 314.53 or in the opinion of the applicant, is claimed by a method-of-use patent, an applicable certification under paragraph (a)(12)(i) of this section.

(iv)  [Reserved]

(v)  *Licensing agreements*.  If the ANDA is for a drug or method of using a drug claimed by a patent and the applicant has a licensing agreement with the patent owner, the applicant must submit a paragraph IV certification as to that patent and a statement that the applicant has been granted a patent license.  If the patent owner consents to approval of the ANDA (if otherwise eligible for approval) as of a specific date, the ANDA must contain a written statement from the patent owner that it has a licensing agreement with the applicant and that it consents to approval of the ANDA as of a specific date.

(vi)  *Untimely filing of patent information*.  (A) If a patent on the listed drug is issued and the holder of the approved NDA for the listed drug does not file with FDA the required information on the patent within 30 days of issuance of the patent, an applicant who submitted an ANDA for that drug that contained an appropriate patent certification or statement before the submission of the patent information is not required to submit a patent certification or statement to address the patent or patent information that is late-listed with respect to the pending ANDA.  Except as provided in § 314.53(f)(1), an NDA holder's amendment to the description of the approved method(s) of use claimed by the patent will be considered untimely filing of patent information unless:

(*1*)  The amendment to the description of the approved method(s) of use claimed by the patent is submitted within 30 days of patent issuance;

(*2*)  The amendment to the description of the approved method(s) of use claimed by the patent is submitted within 30 days of approval of a corresponding change to product labeling; or

(*3*)  The amendment to the description of the approved method(s) of use claimed by the patent is submitted within 30 days of a decision by the U.S. Patent and Trademark Office or by a Federal district court, the Court of Appeals for the Federal Circuit, or the U.S. Supreme Court that is specific to the patent and alters the

construction of a method-of-use claim(s) of the patent, and the amendment contains a copy of the decision.

(B) An applicant whose ANDA is submitted after the NDA holder's untimely filing of patent information, or whose pending ANDA was previously submitted but did not contain an appropriate patent certification or statement at the time of the patent submission, must submit a certification under paragraph (a)(12)(i) of this section and/or a statement under paragraph (a)(12)(iii) of this section as to that patent.

(vii) *Disputed patent information*. If an applicant disputes the accuracy or relevance of patent information submitted to FDA, the applicant may seek a confirmation of the correctness of the patent information in accordance with the procedures under § 314.53(f). Unless the patent information is withdrawn, the applicant must submit an appropriate certification or statement for each listed patent.

(viii) *Amended certifications*. A patent certification or statement submitted under paragraphs (a)(12)(i) through (iii) of this section may be amended at any time before the approval of the ANDA. If an applicant with a pending ANDA voluntarily makes a patent certification for an untimely filed patent, the applicant may withdraw the patent certification for the untimely filed patent. An applicant must submit an amended certification as an amendment to a pending ANDA. Once an amendment is submitted to change a certification, the ANDA will no longer be considered to contain the prior certification.

(A) *After finding of infringement*. An applicant who has submitted a paragraph IV certification and is sued for patent infringement must submit an amendment to change its certification if a court enters a final decision from which no appeal has been or can be taken, or signs and enters a settlement order or consent decree in the action that includes a finding that the patent is infringed, unless the final decision, settlement order, or consent decree also finds the patent to be invalid. In its amendment, the applicant must certify under paragraph (a)(12)(i)(A)(*3*) of this section that the patent will expire on a specific date or, with respect to a patent claiming a method of use, the applicant may instead provide a statement under paragraph (a)(12)(iii) of this section if the applicant amends its ANDA such that the applicant is no longer seeking approval for a method of use claimed by the patent. Once an amendment for the change has been submitted, the ANDA will no longer be considered to contain a paragraph IV certification to the patent. If a final judgment finds the patent to be invalid and infringed, an amended certification is not required.

(B) *After request to remove a patent or patent information from the list*. If the list reflects that an NDA holder has requested that a patent or patent information be removed from the list and no ANDA applicant is eligible for 180-day exclusivity

ADD-36

based on a paragraph IV certification to that patent, the patent or patent information will be removed and any applicant with a pending ANDA (including a tentatively approved ANDA) who has made a certification with respect to such patent must submit an amendment to withdraw its certification. In the amendment, the applicant must state the reason for withdrawing the certification or statement (that the patent has been removed from the list). If the list reflects that an NDA holder has requested that a patent or patent information be removed from the list and one or more first applicants are eligible for 180-day exclusivity based on a paragraph IV certification to that patent, the patent will remain listed until any 180-day exclusivity based on that patent has expired or has been extinguished. After any applicable 180-day exclusivity has expired or has been extinguished, the patent or patent information will be removed and any applicant with a pending ANDA (including a tentatively approved ANDA) who has made a certification with respect to such patent must submit an amendment to withdraw its certification. Once an amendment to withdraw the certification has been submitted, the ANDA will no longer be considered to contain a paragraph IV certification to the patent. If removal of a patent from the list results in there being no patents listed for the listed drug identified in the ANDA, the applicant must submit an amended certification reflecting that there are no relevant patents.

(C) *Other amendments*. (*1*) Except as provided in paragraphs (a)(12)(vi) and (a)(12)(viii)(C)(*2*) of this section:

(*i*) An applicant must amend a submitted certification or statement if, at any time before the date of approval of the ANDA, the applicant learns that the submitted certification or statement is no longer accurate; and

(*ii*) An applicant must submit an appropriate patent certification or statement under paragraph (a)(12)(i) and/or (iii) of this section if, after submission of the ANDA, a new patent is issued by the U.S. Patent and Trademark Office that, in the opinion of the applicant and to the best of its knowledge, claims the reference listed drug or that claims an approved use for such reference listed drug and for which information is required to be filed under section 505(b) and (c) of the Federal Food, Drug, and Cosmetic Act and § 314.53. For a paragraph IV certification, the certification must not be submitted earlier than the first working day after the day the patent is published in the list.

(*2*) An applicant is not required to submit a supplement to change a submitted certification when information on a patent on the listed drug is submitted after the approval of the ANDA.

(13) *Financial certification or disclosure statement.*  An ANDA must contain a financial certification or disclosure statement as required by part 54 of this chapter.

\* \* \*